Sheri M. Thome, Esq.
Nevada Bar No. 008657
Chad C. Butterfield, Esq.
Nevada Bar No. 010532
**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
300 S. Fourth Street, 11th Floor
Las Vegas, Nevada 89101
(702) 727-1400; FAX (702) 727-1401
sheri.thome@wilsonelser.com
chad.butterfield@wilsonelser.com
*Attorneys for Defendant Delaware Charter*
*Guarantee & Trust Company*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KEVIN and SUSAN LEWIS, on behalf of themselves and all others similarly situated, <br><br> Plaintiffs, <br><br> vs. <br><br> DELAWARE CHARTER GUARANTEE & TRUST COMPANY d/b/a PRINCIPAL TRUST COMPANY, PRINCIPAL FINANCIAL GROUP, INC., and DAVID LERNER ASSOCIATES, INC., <br><br> Defendants. | CASE NO: 2:13-cv-01809-GMN-GWF <br><br> **UNOPPOSED MOTION FOR LEAVE TO CORRECT DEFENDANT DELAWARE CHARTER GUARANTEE & TRUST COMPANY'S MOTION TO DISMISS [DOC. 35]** |

Defendant Delaware Charter Guarantee & Trust Company ("Delaware Charter") respectfully requests leave to correct formatting issues in Delaware Charter's Motion to Dismiss [Doc. 35].

### MEMORANDUM OF POINTS AND AUTHORITIES

Delaware Charter respectfully requests leave of Court to correct its Motion to Dismiss [Doc. 35] in order to address formatting errors that occurred during the Optical Character Recognition (OCR) conversion process. Counsel for Delaware Charter did not identify the formatting issues until after having already filed the Motion to Dismiss, thus necessitating this Motion. Plaintiffs will suffer no prejudice as a result of the corrected Motion to Dismiss, as the changes are stylistic only and do not affect the substance of the Motion. [See Delaware Charter's Corrected Motion to Dismiss, attached hereto as Exhibit "A."] Furthermore, Plaintiffs' counsel has represented to counsel

for Delaware Charter that Plaintiffs will not oppose Delaware Charter's request to file a corrected

Motion to Dismiss.

<u>**CONCLUSION**</u>

Based on the foregoing, Delaware Charter respectfully requests an Order from the Court

allowing Delaware Chartered to file a corrected Motion to Dismiss, a copy of which is attached

hereto as Exhibit "A."

DATED this 31st day of December, 2013.

**WILSON, ELSER, MOSKOWITZ, EDELMAN
& DICKER LLP**

BY: /s/Sheri M. Thome

Sheri M. Thome, Esq.
Nevada Bar No. 008657
Chad C. Butterfield, Esq.
Nevada Bar No. 010532
**WILSON, ELSER, MOSKOWITZ,
EDELMAN & DICKER LLP**
300 S. Fourth Street, 11th Floor
Las Vegas, Nevada 89101
(702) 727-1400; FAX (702) 727-1401
sheri.thome@wilsonelser.com
chad.butterfield@wilsonelser.com
*Attorneys for Defendant Delaware Charter
Guarantee & Trust Company*

GOOD CAUSE SHOWN, IT IS SO ORDERED.

DATED this 2nd day of January, 2014.

_____

United States District Judge

## CERTIFICATE OF SERVICE

Pursuant to FRCP 5(b), I certify that I am an employee of WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, and that on this 31st ay of December, 2013, I electronically filed and served a true and correct copy of the foregoing **UNOPPOSED MOTION FOR LEAVE TO CORRECT DEFENDANT DELAWARE CHARTER GUARANTEE & TRUST COMPANY'S MOTION TO DISMISS [DOC. 35]** to all parties identified on file with the CM/ECF.

T. James Truman
T. JAMES TRUMAN & ASSOCIATES
3654 N. Rancho Drive
Las Vegas, NV 89130
district@trumanlegal.com

L. Timothy Fisher
Annick M. Persinger
BURSOR & FISHER, PA
1990 N. California Blvd., Ste 940
Walnut Creek, CA 94596
ltfisher@bursor.com
apersinger@bursor.com
*Attorneys for Plaintiffs*

J. Colby Williams
CAMPBELL & WILLIAMS
700 S 7th Street
Las Vegas, NV 89101
jcw@campbellandwilliams.com

Michael D. Blanchard
BINGHAM McCUTHCHEN LLP
1 State Street
Hartford, CT 06103
michael.blanchard@bingham.com

Derek M. Care
Kenneth I. Schacter
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
derek.care@bingham.com
kenneth.schacter@bingham.com
*Attorneys for Defendant David Lerner Associates, Inc.*

By /s/Annemarie Gourley
An Employee of WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

# EXHIBIT A

# EXHIBIT A

Sheri M. Thome, Esq.
Nevada Bar No. 008657
Chad C. Butterfield, Esq.
Nevada Bar No. 010532
**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**
300 S. Fourth Street, 11th Floor
Las Vegas, Nevada 89101
(702) 727-1400; FAX (702) 727-1401
sheri.thome@wilsonelser.com
chad.butterfield@wilsonelser.com
*Attorneys for Defendant Delaware Charter*
*Guarantee & Trust Company*

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEVADA

| | |
|---|---|
| KEVIN and SUSAN LEWIS, on behalf of themselves and all others similarly situated,<br><br>        Plaintiffs,<br><br>    vs.<br><br>DELAWARE CHARTER GUARANTEE & TRUST COMPANY d/b/a PRINCIPAL TRUST COMPANY, PRINCIPAL FINANCIAL GROUP, INC., and DAVID LERNER ASSOCIATES, INC.,<br><br>        Defendants. | CASE NO:    2:13-cv-01809-GMN-GWF<br><br><br>**DEFENDANT DELAWARE CHARTER GUARANTEE & TRUST COMPANY'S CORRECTED MOTION TO DISMISS** |

Defendant Delaware Charter Guarantee & Trust Company D/B/A Principal Trust Company ("Delaware Charter") respectfully submits this Motion to Dismiss, pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2) and *forum non conveniens*, the Corrected Class Action Complaint (D.E. 17) ("Complaint") filed by plaintiffs, Kevin Lewis and Susan Lewis ("Plaintiffs"). Plaintiffs' claims against Delaware Charter should be dismissed for the following reasons:

1.    Plaintiffs' Complaint should be dismissed for *forum non conveniens*. Plaintiffs' Trust Agreement with Delaware Charter contains a Forum Selection Clause vesting exclusive jurisdiction of Plaintiffs' claims against Delaware Charter in Delaware courts.

2.    This Court lacks personal jurisdiction over Delaware Charter. Fed. R. Civ. P. 12(b)(2). Because Plaintiffs have failed to allege that Delaware Charter has sufficient minimum

586480.1

contacts with the State of Nevada, neither general personal jurisdiction nor specific personal jurisdiction exists.

3.     Plaintiffs lack Article III standing to assert claims against Delaware Charter.  Fed. R. Civ. P. 12(b)(1).  In a multi-defendant case, a putative class representative must allege that he or she has satisfied all three elements of Article III standing as to *each* defendant in order to establish Article III standing as to each defendant.  Because Plaintiffs have failed to allege every element of standing specifically as to Delaware Charter, Plaintiffs lack Article III standing to bring claims against Delaware Charter.

WHEREFORE, premises considered, Defendant Delaware Charter respectfully requests that this Court grant Delaware Charter's Motion to Dismiss Plaintiffs' Complaint.

DATED this 31st day of December, 2013

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**

BY: /s/Sheri M. Thome
Sheri M. Thome, Esq.
Nevada Bar No. 008657
Chad C. Butterfield, Esq.
Nevada Bar No. 010532
300 S. Fourth Street, 11th Floor
Las Vegas, Nevada 89101
(702) 727-1400; FAX (702) 727-1401
sheri.thome@wilsonelser.com
chad.butterfield@wilsonelser.com
*Attorneys for Defendant Delaware Charter Guarantee & Trust Company*

586480.1

# **TABLE OF CONTENTS**

Introduction .......................................................................................................................4

Plaintiffs' Allegations ...................................................................................................5

Argument ...........................................................................................................................6

    I.      Plaintiffs' Claims Against Delaware Charter Should Be Dismissed for *Forum Non Conveniens* Because the Trust Agreement Contains a Mandatory Forum Selection Clause. ........................................................................................................6

          A.     The Parties' Trust Agreement Contains a Valid Forum Selection Clause Encompassing Plaintiffs' Claims. .....................................................6

               1.    Delaware Law Governs the Interpretation of the Forum Selection Clause. ..........................................................................6

               2.    The Forum Selection Clause Is Valid under Delaware Law. ...............7

               3.    The Forum Selection Clause Applies to All of Plaintiffs' Claims. .......7

          B.     The Forum Selection Clause Vests Exclusive Jurisdiction in Delaware State Courts. ...................................................................................9

          C.     The Forum Selection Clause Requires Dismissal of Plaintiffs' Claims for *Forum Non Conveniens*. ..............................................................10

    II.    This Court Lacks Personal Jurisdiction Over Delaware Charter ..........................12

          A.     Plaintiffs Have Failed To Establish General Personal Jurisdiction over Delaware Charter. ..................................................................................13

          B.     Plaintiffs Have Failed To Establish Specific Personal Jurisdiction over Delaware Charter. ..................................................................................14

    III.   Plaintiffs Lack Article III Standing to Assert Claims Against Delaware Charter. .................................................................................................................16

Conclusion ......................................................................................................................19

Certificate of Service ...............................................................................................20

586480.1

**MEMORANDUM OF POINTS AND AUTHORITIES
IN SUPPORT OF ITS MOTION TO DISMISS**

Defendant Delaware Charter Guarantee & Trust Company D/B/A Principal Trust Company ("Delaware Charter") respectfully submits this Memorandum of Points and Authorities in support of its Motion to Dismiss ("Motion"), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(2) and *forum non conveniens*, the Corrected Class Action Complaint (D.E. 17) ("Complaint") filed by plaintiffs, Kevin Lewis and Susan Lewis ("Plaintiffs").

## INTRODUCTION

Plaintiffs filed this purported class action on behalf of individuals who opened self-directed individual retirement accounts ("IRAs") with Delaware Charter to purchase shares in several non-publicly traded Real Estate Investment Trusts ("REITs") underwritten and marketed by Defendant David Lerner Associates ("Lerner Associates"), a retail broker-dealer in Syosset, New York. Plaintiffs claim Delaware Charter failed to provide them with an independent annual accounting of their investments' fair market value.[1]   Although Plaintiffs' allegations are contradicted by the governing documents, it is unnecessary for the Court to reach those issues because Plaintiffs' claims should be dismissed on three independent threshold jurisdictional grounds.  First, when Plaintiffs opened the IRAs, they agreed jurisdiction and venue for any claims against Delaware Charter related to those accounts would lie exclusively in Delaware; as a result, Plaintiffs' claims against Delaware Charter must be dismissed for *forum non conveniens* based on the United States Supreme Court's recent decision in *Atlantic Marine Constr. Co. v. U.S. District Court for the Western District of Tex.*, No. 12-929, 2013 WL 6231157 (U.S. Dec. 3, 2013) ("*Atlantic Marine*").  Second, Plaintiffs have failed to establish general personal jurisdiction or specific personal jurisdiction over Delaware Charter.  Third, Plaintiffs have not alleged Article III standing for their claims against Delaware Charter.  For these three reasons and the reasons below, the Complaint should be dismissed as a matter of law.

/ / /

/ / /

---

[1] Complaint at ¶¶ 23-25.

# PLAINTIFFS' ALLEGATIONS

Plaintiffs bring this purported class action "on behalf of people who invested in certain real estate investment trusts (the 'REITs') as part of their individual retirement accounts ('IRAs') with Defendants Principal and DLA."[2]  "Plaintiffs and the members of the Class invested in one or more Apple REITs, including but not limited to, Apple REIT 6, Apple REIT 7, Apple REIT 8, Apple REIT 9, and Apple REIT 10, (hereinafter the 'Apple REITs') as part of their IRAs with Defendants Principal and DLA."[3]  Plaintiffs allege "Principal" failed to comply with its contractual obligation to provide them with an "accounting, valuing the assets at fair market value."[4]  Instead, "Principal" has relied on "regularly issued broker-dealer statements created and mailed to Class Members" to satisfy this obligation.[5]  The broker statements historically listed the value of the Apple REITS at the original offering price of $11.00 per share, but in 2011 and 2012, they reported "no valuation whatsoever for the Apple REITs."[6]  "Instead, the shares of these products were reported as 'Not Priced' and 'Unpriced' in various sections of the statements."[7]

---

[2] Complaint ¶ 1.  Paragraph 17 of the Complaint references the Application Booklets that contain the Self-Directed Individual Retirement Trust Agreement ("Trust Agreement").  A copy of the in-force Trust Agreement applicable to plaintiffs Kevin Lewis and Susan Lewis is submitted herewith as Exhibit A to the Declaration of Kristin Camp ("Camp Decl.").  This Court may consider the Trust Agreement without converting this Motion into one for summary judgment.  *Knieval v. ESPN*, 393 F.3d 1068, 1076 (9th Cir. 2005) (recognizing court may consider documents "whose contents are alleged in a complaint and whose authenticity no party questions, but which are not physically attached to the [plaintiff's] pleading.").

[3] Complaint ¶ 15.  Plaintiffs' Complaint impermissibly lumps Principal Financial Group, Inc. ("The Principal") and Delaware Charter together as "Principal."  This type of "shotgun" pleading conflicts with the Supreme Court's pronouncements in *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544 (2007) ("*Twombly*"), and *Ashcroft v. Iqbal*, 556 U.S. 662 (2009) ("*Iqbal*").  *Megino v. Linear Fin.*, No. 2:09-CV-00370-KJD, 2011 WL 53086, at *4 (D. Nev. Jan. 6, 2011) ("Plaintiffs' 'shotgun' pleading against all Defendants in support of this claim . . . do not cross the line into creating a plausible claim for relief."); *Sollberger v. Wachovia Sec., LLC*, No. SACV 09-0766AGANX, 2010 WL 2674456, at *4 (C.D. Cal. June 30, 2010) ("Shotgun pleadings are pleadings that overwhelm defendants with an unclear mass of allegations and make it difficult or impossible for defendants to make informed responses to the plaintiff's allegations. They are unacceptable.").  The Complaint also fails to provide the requisite specificity about which specific Apple REIT(s) or other "certain real estate investment trusts" Plaintiffs invested in through Lerner Associates.

[4] Complaint ¶ 22.

[5] Complaint ¶ 25.

[6] Complaint ¶¶ 25 (emphasis omitted), 27.

[7] Complaint ¶ 25.

Based on these allegations, Plaintiffs assert six claims generically against "Principal" – Breach of Contract (Count 1), Breach of Trust (Count 2), Breach of Fiduciary Duty (Count 3), Negligence (Count 6), Intentional Misrepresentation (Count 7) and Negligent Misrepresentation (Count 8).

## ARGUMENT

**I.  Plaintiffs' Claims Against Delaware Charter Should Be Dismissed For *Forum Non Convieniens* Because The Trust Agreement Contains A Mandatory Forum Selection Clause.**

The Trust Agreement between Plaintiffs and Delaware Charter contains a mandatory forum selection clause, which provides "[j]urisdiction and venue of any matter not subject to the arbitration provisions of this Trust Agreement shall lie **solely in the courts of the State of Delaware**."  *See* Trust Agreement § 5.8(K) ("Forum Selection Clause") (emphasis added).  Plaintiffs failed to abide by the Forum Selection Clause when they filed this civil action in this Court, and therefore their claims against Delaware Charter should be dismissed.  *See Atlantic Marine*, 2013 WL 6231157, at *13 n.8 (explaining "when the plaintiff has violated a contractual obligation by filing suit in a forum other than the one specified in a valid forum-selection clause" a "successful motion under *forum non conveniens* requires dismissal of the case.")

**A.  The Parties' Trust Agreement Contains a Valid Forum Selection Clause Encompassing Plaintiffs' Claims.**

**1.  Delaware Law Governs the Interpretation of the Forum Selection Clause.**

"[U]nder controlling Ninth Circuit authority, when a contract contains a choice of law provision, the validity of the contract's forum selection clause is governed by the jurisdiction the parties specified in the choice of law clause."  *Stellia Ltd. v. B+S Card Serv. GmbH*, No. 2:12-CV-01099-GMN, 2013 WL 1195709, at *5 (D. Nev. Mar. 22, 2013); *see also E. & J. Gallo Winery v. Andina Licores S.A.*, 446 F.3d 984, 994 (9th Cir. 2006) ("[T]he contract clearly contains a California choice-of-law clause; thus, the validity of the forum selection clause should be decided by California law, as the law of the contract.").  The Trust Agreement between Plaintiffs and Delaware Charter contains a choice-of-law provision, which specifies the Trust Agreement was "made pursuant to and

shall be construed in accordance with the laws of the State of Delaware."[8]  Therefore, this Court should apply Delaware law when interpreting the Trust Agreement's Forum Selection Clause.[9]

### 2. The Forum Selection Clause Is Valid under Delaware Law.

Under Delaware law, "'[f]orum selection [ ] clauses are "presumptively valid" and should be "specifically" enforced unless the resisting party "[ ] clearly show[s] that enforcement would be unreasonable and unjust, or that the clause [is] invalid for such reasons as fraud and overreaching."'" *Ingres Corp. v. CA, Inc.*, 8 A.3d 1143, 1146 (Del. 2010) (quoting *Capital Grp. Cos. v. Armour*, No. Civ. A. 422-N, 2004 WL 2521295, at *3 (Del. Ch. Oct. 29, 2004)); *see also Nat'l Indus. Grp. (Holding) v. Carlyle Inv. Mgmt. L.L.C.*, 67 A.3d 373, 381 (Del. 2013) ("[a] valid forum selection clause must be enforced.").  Plaintiffs cannot bear this heavy burden and make no such allegations in their Complaint. *See HealthTrio, Inc. v. Margules*, No. Civ. A. 06C-04-196, 2007 WL 544156, at *3 (Del. Super. Jan. 16, 2007) ("By requiring a showing of unreasonableness, the Delaware courts have placed a heavy burden on the plaintiff.").  Plaintiffs voluntarily entered the Trust Agreement and as such knowingly and willingly consented to the valid Forum Selection Clause.

### 3. The Forum Selection Clause Applies to All of Plaintiffs' Claims.

The Trust Agreement's Forum Selection Clause encompasses all of Plaintiffs' claims – whether they sound in contract or tort.  Under Delaware law, "[f]orum selection clauses can be applied not only to contract-based claims but also tort claims arising out of, or depending upon, the contractual relationship in question." *Ashall Homes*, 992 A.2d at 1245; *see also Loveman v. Nusmile, Inc.*, No. CIV.A. 08C-08-223MJB, 2009 WL 847655, at *4 (Del. Super. Mar. 31, 2009) ("*Loveman*") ("Authority from this and other jurisdictions provides that 'where the relationship between the parties is contractual, the pleading of alternative non-contractual theories of liability should not prevent enforcement of such a bargain.'" (citations omitted)).  Therefore, the Trust Agreement's Forum Selection Clause applies not only to Plaintiffs' breach of contract claim against

---

[8] *See* Trust Agreement § 5.8(K).
[9] *Compare Ashall Homes Ltd. v. ROK Entm't Grp. Inc.*, 992 A.2d 1239, 1245 (Del. Ch. 2010) ("*Ashall Homes*") (Under Delaware law, "[w]hen a contract contains a forum selection clause, [Delaware courts] will interpret the forum selection clause in accordance with the law chosen to govern the contract.").

586480.1

Delaware Charter, but also to Plaintiffs' tort claims arising out of obligations created by the Trust Agreement. Plaintiffs rely on the Trust Agreement for all of their tort claims – breach of trust, breach of fiduciary duty, aiding and abetting breach of fiduciary duty, negligence, intentional misrepresentation, and negligent misrepresentation.[10] Therefore, all of Plaintiffs' claims fall within the Forum Selection Clause.

The Forum Selection Clause provides "[j]urisdiction and venue of any matter not subject to the arbitration provisions of this Trust Agreement shall lie solely in the courts of the State of Delaware."[11] Plaintiffs' purported class action is not subject to the arbitration provision in the Trust Agreement; thus bringing it directly within the scope of the Forum Selection Clause. Plaintiffs filed this civil action in federal court, rather than seeking arbitration. Delaware Charter has not sought to compel arbitration. Therefore, Plaintiffs' purported class action cannot be subject to arbitration. Because Plaintiffs' action is "not subject to the arbitration provisions of this Trust Agreement," jurisdiction and venue over this action "shall lie solely in the courts of the State of Delaware."[12] This Court should enforce the Forum Selection Clause and dismiss Plaintiffs' claims against Delaware Charter.[13]

---

[10] *See* Complaint ¶ 54 ("Principal's failure to abide by the terms of the Trust Agreement and other acts of commission or omission constitute breaches of trust."); ¶ 61 ("Principal breached its fiduciary duties to Plaintiffs and the Class by failing to perform its duties under the Trust Agreement"); ¶ 73 ("Principal breached its fiduciary duties to Plaintiffs and the Class by failing to perform its duties under the Trust Agreement"); ¶ 80 ("Defendants breached their duties to Plaintiffs and the Class by failing to perform their duties under the Trust Agreement"); ¶ 84 ("As the Trustee [under the Trust Agreement], Principal owed a duty to Plaintiffs and the Class to act with due care."); ¶ 93 ("As the Trustee [under the Trust Agreement], Principal owed a duty to Plaintiffs and the Class to act with due care.").

[11] Trust Agreement § 5.8.(K).

[12] Trust Agreement § 5.8.(K).

[13] Plaintiffs' claims fall outside of the arbitration provision for the additional reason that Plaintiffs have alleged a putative class action against Delaware Charter, The Principal, and Lerner Associates. Lerner Associates's Client Agreement with Plaintiffs includes a class action arbitration waiver expressly prohibiting class action arbitrations. (Lerner Associates's Client Agreement, ¶14(H), attached to Lerner Associates's Memorandum of Law in Support of Motion to Dismiss for Lack of Personal Jurisdiction and Improper Venue, or in the Alternative, To Transfer Venue to the Eastern District of New York); *see Stolt-Nielsen S.A. v. AnimalFeeds Int'l Corp.*, 559 U.S. 662, 684 (2010) ("[I]t follows that a party may not be compelled under the FAA to submit to class arbitration unless there is a contractual basis for concluding that the party agreed to do so."); *Am. Exp. Co. v. Italian Colors Rest.*, 133 S. Ct. 2304 (2013). Delaware Charter, a non-signatory, can enforce the terms of

**B.    The Forum Selection Clause Vests Exclusive Jurisdiction in Delaware State Courts.**

The Trust Agreement's Forum Selection Clause vests jurisdiction "in the courts *of* the State of Delaware."[14]  It is a "widely-accepted rule that forum selection clauses that use the term 'in [a state]' express the parties' intent as a matter of geography, permitting jurisdiction in both the state and federal courts of the named state, whereas forum selection clauses that use the term 'of [a state]' connote sovereignty, limiting jurisdiction over the parties' dispute to the state courts of the named state." *FindWhere Holdings, Inc. v. Sys. Env't Optimization, LLC*, 626 F.3d 752, 755 (4th Cir. 2010) (interpreting Delaware law).

The Ninth Circuit is in accord. In *Doe 1 v. AOL LLC*, the Ninth Circuit "addressed the meaning of a forum selection clause designating the courts 'of,' rather than 'in,' a state" and ruled clauses using "of" refer to state courts only and clauses using "in" refer to state courts and federal courts. 552 F.3d 1077, 1081-82 (9th Cir. 2009).  Because the Trust Agreement's Forum Selection Clause limits jurisdiction to the courts "of" Delaware, Plaintiffs must bring their claims against Delaware Charter solely in Delaware state courts.[15]

---

the Lerner Associates' Client Agreement under an equitable estoppel theory. *See Douzinas v. Am. Bureau of Shipping, Inc.*, 888 A.2d 1146, 1153 (Del. Ch. Ct. 2006) ("Under abundant authority, non-signatories are permitted to compel signatories to arbitrate disputes under a theory of equitable estoppel.").  Here, both circumstances for equitable estoppel are present:  (1) Plaintiffs rely on the Lerner Associates' Client Agreement in asserting their claims against Delaware Charter, *see Wilcox & Fetzer, Ltd. v. Corbett & Wilcox*, No. Civ. A. 2037-N, 2006 WL 2473665, at *5 (Del. Ch. Ct. Aug. 22, 2006); and (2) Plaintiffs raise "allegations of substantially interdependent and concerted misconduct by both the nonsignatory [Delaware Charter] and one or more of the signatories to the contract [Lerner Associates]," *id.* (quoting *Grigson v. Creative Artists Agency L.L.C.*, 210 F.3d 524, 527 (5th Cir. 2000)) (emphasis omitted).  *See, e.g.*, Complaint ¶ 20 ("Brokerage accounts for each Class Member's IRA trust(s) were opened with DLA and registered in the name of the Trustee."); ¶ 63 ("Principal also breached its fiduciary duties to Plaintiffs and the Class by 'negligently continuing the agency relationship' with Defendant DLA even though DLA failed to satisfy its obligations under the law."); ¶ 21 ("Principal and DLA have an agency agreement whereby Principal agrees to serve as IRA Trustee for DLA brokerage customers and DLA agrees to handle certain administrative functions on behalf of Principal."); ¶ 25 ("Principal has relied on 'regularly issued broker-dealer statements' mailed to Class Members by DLA to satisfy this obligation.").  Therefore, Delaware Charter can enforce the class action arbitration waiver in the Lerner Associates's Client Agreement, prohibiting Plaintiffs from arbitrating their class claims.

[14] Trust Agreement § 5.8(K) (emphasis added).

[15] The Trust Agreement's Forum Selection Clause is mandatory, not permissive, under Delaware law.  A forum selection clause that includes the terms "any" and "shall" is "a mandatory, rather than

## C. The Forum Selection Clause Requires Dismissal of Plaintiffs' Claims For *Forum Non Conveniens.*

The United States Supreme Court recently held in a unanimous decision, "the appropriate way to enforce a forum-selection clause pointing to a state or foreign forum is through the doctrine of *forum non conveniens.*" *Atlantic Marine*, 2013 WL 6231157, at *10.[16] "When the parties have agreed to a valid forum-selection clause, a district court should ordinarily" honor that choice, either transferring the action to the selected federal forum under Section 1404(a) or dismissing the action destined for a state court forum under *forum non conveniens. Id.* at *11, *13 n.8. "Only under extraordinary circumstances unrelated to the convenience of the parties should a §1404(a) [or *forum non conveniens*] motion be denied." *Id.* at *11.

As the Supreme Court explained, "[i]n the typical case not involving a forum-selection clause, a district court considering a §1404(a) motion (or a *forum non conveniens* motion) must evaluate both the convenience of the parties and various public-interest considerations." *Id.; see also Boston Telecomm. Grp., Inc. v. Wood*, 588 F.3d 1201, 1206 (9th Cir. 2009) ("*Boston Telecomm. Grp.*").[17] "The calculus changes, however, when the parties' contract contains a valid forum-selection clause, which 'represents the parties' agreement as to the most proper forum.'" *Atlantic Marine*, 2013 WL 6231157, at *11 (quoting *Stewart Org., Inc. v. Ricoh Corp.*, 487 U.S. 22, 31 (1988) ("*Stewart*")). "[A] valid forum-selection clause [should be] given controlling weight in all

---

permissive, grant of jurisdiction." *See Ashall Homes*, 992 A.2d at 1250. The Forum Selection Clause in the Trust Agreement not only contains the words "any" and "shall" but also states jurisdiction and venue shall lie "solely" in Delaware. *See* Trust Agreement § 5.8(K). It is clear from the language of the Forum Selection Clause the parties intended any lawsuits be filed exclusively in Delaware. "If a forum selection clause validly limits a plaintiff to a single forum, that clause operates to divest a court that otherwise has jurisdiction of its status as a proper venue for the plaintiff to sue." *Loveman*, 2009 WL 847655, at *3 (quoting *Simon v. Navellier Series Funds*, No. 17734, 2000 WL 1597890, at *6 (Del. Ch. Ct. Oct. 19, 2000)).

[16] The Ninth Circuit had formerly held "a district court should analyze a motion to dismiss based on a forum selection clause in a contract under Rule 12(b)(3), which controls motions to dismiss for improper venue." *Levesque v. Trans Union, LLC*, 2:09-CV-01393-RLH, 2010 WL 3522264, at *1 (D. Nev. Sept. 1, 2010). However, in *Atlantic Marine*, 2013 WL 6231157, at *4, the Supreme Court expressly "reject[ed] [the] argument that a [forum selection] clause may be enforced by a motion to dismiss under 28 U.S.C. §1406(a) or Rule 12(b)(3) of the Federal Rules of Civil Procedure."

[17] The Ninth Circuit has held that "federal rather than state law governs" a *forum non conveniens* motion. *Ravelo Monegro v. Rosa*, 211 F.3d 509, 511 (9th Cir. 2000).

but the most exceptional cases." *Id.* (quoting *Stewart*, 487 U.S. at 33 (Kennedy, J., concurring) (modification in original)).

"The presence of a valid forum-selection clause requires district courts to adjust their usual" section 1404(a) or *forum non conveniens* analysis in several ways. *Id.*[18] First, the burden shifts. Ordinarily, "the burden of proving an alternative forum is the defendant's." *Contract Lumber Co. v. P.T. Moges Shipping Co. Ltd.*, 918 F.2d 1446, 1449 (9th Cir. 1990) (quoting *Cheng v. Boeing Co.*, 708 F.2d 1406, 1411 (9th Cir. 1983)). However, the presence of a forum selection clause shifts the burden to the Plaintiffs: "as the party defying the forum-selection clause, the plaintiff bears the burden of establishing that transfer to the forum for which the parties bargained is unwarranted." *Atlantic Marine*, 2013 WL 6231157, at *11. As here, when a forum selection clause is present, the Supreme Court explained the Plaintiffs' "choice of forum" in filing their lawsuit "merits no weight." *Id.* Because Plaintiffs have already chosen the forum through the Forum Selection Clause, "that initial choice deserves deference, and the plaintiff must bear the burden of showing why the court should not transfer the case to the forum to which the parties agreed." *Id.* Plaintiffs cannot meet that burden here.

Second, the Court "should not consider arguments about the parties' private interests." *Id.* at *12. "When parties agree to a forum-selection clause, they waive the right to challenge the preselected forum as inconvenient or less convenient for themselves or their witnesses, or for their pursuit of the litigation." *Id.* "A court accordingly must deem the private-interest factors to weigh entirely in favor of the preselected forum." *Id.*

---

[18] Although *Atlantic Marine* involved a motion to transfer under Section 1404(a) based on a forum selection clause that designated a federal court or state court, the Supreme Court explained that the analysis was equally applicable to consideration of a motion to dismiss for *forum non conveniens* based on a forum selection clause that designated a state court forum. Because "both §1404 and the *forum non conveniens* doctrine from which it derives entail the same balancing-of-interests standard, courts should evaluate a forum-selection clause pointing to a nonfederal forum in the same way that they evaluate a forum-selection clause pointing to a federal forum." *Atlantic Marine*, 2013 WL 6231157, at *10; *id.* at *13 n.8 ("the same standards should apply to motions to dismiss for *forum non conveniens* in cases involving valid forum-selection clauses pointing to state or foreign forums").

586480.1

"As a consequence, a district court may consider arguments about public-interest factors only." *Id.*[19]  As the Supreme Court recently explained, "[b]ecause those factors will rarely defeat a transfer motion, the practical result is that forum-selection clauses should control except in unusual cases." *Id.*[20]  Plaintiffs' action is far from an "unusual case."  This action involves events, which transpired in Delaware with a Delaware company.  "As the party acting in violation of the forum-selection clause, [Plaintiffs] must bear the burden of showing that public-interest factors overwhelmingly disfavor" requiring the Plaintiffs to litigate in Delaware.  *Id.* at *13.  Plaintiffs cannot meet that high burden.

"When parties have contracted in advance to litigate disputes in a particular forum, courts should not unnecessarily disrupt the parties' settled expectations." *Id.*  "In all but the most unusual cases, therefore, 'the interest of justice' is served by holding parties to their bargain." *Id.*  Here, the Plaintiffs bargained with Delaware Charter for Delaware courts, and this Court should hold them to that bargain.  Because Plaintiffs' Trust Agreement contains a valid Forum Selection Clause designating exclusive jurisdiction in Delaware courts, "*forum non conveniens* requires dismissal of the case." *See id.* at *13 n.8.

## II.    This Court Lacks Personal Jurisdiction Over Delaware Charter.

Plaintiffs' claims should also be dismissed for lack of personal jurisdiction over Delaware Charter under Federal Rule of Civil Procedure 12(b)(2).  Because Plaintiffs have failed to allege Delaware Charter has sufficient minimum contacts with the State of Nevada, neither general personal jurisdiction nor specific personal jurisdiction exists.  *CollegeSource, Inc. v. AcademyOne,*

---

[19] The public-interest factors include "the administrative difficulties flowing from court congestion; the 'local interest in having localized controversies decided at home'; the interest in having the trial of a diversity case in a forum that is at home with the law that must govern the action; the avoidance of unnecessary problems in conflict of laws, or in the application of foreign law; and the unfairness of burdening citizens in an unrelated forum with jury duty." *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 241 n.6 (1981); *see also Chateau Des Charmes Wines Ltd. v. Sabate USA, Inc.*, No. C-01-4203-MMC, 2003 WL 22682483, at *1 (N.D. Cal. Nov. 10, 2003).

[20] *Atlantic Marine*, 2013 WL 6231157, at *12 ("Although it is 'conceivable in a particular case' that the district court 'would refuse to transfer [or dismiss] a case notwithstanding the counter-weight of a forum-selection clause,' such cases will not be common.") (quoting *Stewart*, 487 U.S. at 30-31).

586480.1

*Inc.*, 653 F.3d 1066, 1073 (9th Cir. 2011) ("*CollegeSource*") (noting "the plaintiff bears the burden of establishing" personal jurisdiction over the non-resident defendant).[21]

**A.  Plaintiffs Have Failed To Establish General Personal Jurisdiction Over Delaware Charter.**

Plaintiffs cannot meet the "exacting standard" of general personal jurisdiction. *See Schwarzenegger v. Fred Martin Motor Co.*, 374 F.3d 797, 801 (9th Cir. 2004) ("*Schwarzenegger*"). Plaintiffs' Complaint contains no jurisdictional allegations against Delaware Charter. Instead, Plaintiffs offer the single, conclusory allegation "[t]his Court has personal jurisdiction over Defendants because Defendants have significant continuous and pervasive contacts with the State of Nevada."[22] Plaintiffs' allegation is wholly unsupported by Plaintiffs' own Complaint and is directly contradicted by the evidence. *See CollegeSource*, 653 F.3d at 1073.

Delaware Charter is not a resident of Nevada.[23] Delaware Charter does not maintain offices in Nevada.[24] It does not own, lease, rent, or control any real or personal property in Nevada.[25] Delaware Charter does not employ agents in Nevada.[26] It maintains no bank accounts in Nevada.[27] Delaware Charter does not pay state taxes in Nevada.[28] Because Delaware Charter is "in no sense at home" in Nevada, this Court lacks general personal jurisdiction over Delaware Charter. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, ___ U.S. ___, 131 S. Ct. 2846, 2857 (2011) ("*Goodyear*").

---

[21] The Principal has also filed a motion to dismiss based on lack of personal jurisdiction. In order to avoid burdening this Court with duplicative briefing, Delaware Charter adopts and incorporates the legal standard and discussion from that personal jurisdiction section of The Principal's brief as if set out here in full.

[22] Complaint ¶ 12.

[23] Complaint ¶ 8 (alleging that Delaware Charter is "organized under the laws of the State of Delaware with its principal place of business in Wilmington, Delaware"); Complaint ¶ 19 (alleging that Delaware Charter "is a Delaware chartered non-deposit trust company licensed by the Delaware Bank Commissioner to provide trust services.").

[24] *See* Camp Decl. at ¶ 6.

[25] *See* Camp Decl. at ¶ 5.

[26] *See* Camp Decl. at ¶ 5.

[27] *See* Camp Decl. at ¶ 5.

[28] *See* Camp Decl. at ¶ 6.

586480.1

**B.     Plaintiffs Have Failed To Establish Specific Personal Jurisdiction Over Delaware Charter.**

Nor have Plaintiffs met their burden of establishing that this Court has specific personal jurisdiction over Delaware Charter.  *See Schwarzenegger*, 374 F.3d at 802 (requiring for specific personal jurisdiction purposeful contacts between the non-resident defendant and the forum state that establish the plaintiffs' claims).  Plaintiffs have failed to allege Delaware Charter "performed some type of affirmative conduct which allows or promotes the transaction of business within the forum state."  *Sher v. Johnson*, 911 F.2d 1357, 1362 (9th Cir. 1990) ("*Sher*") (quoting *Sinatra v. Nat'l Enquirer, Inc.*, 854 F.2d 1191, 1195 (9th Cir. 1988)).  Plaintiffs point to *no* actions *by* Delaware Charter, which took place *in* Nevada invoking "the benefits and protections of the laws in the forum."  *Pebble Beach Co. v. Caddy*, 453 F.3d 1151, 1155 (9th Cir. 2006).  "The defendant trust company has no office in [Nevada], and transacts no business there."  *Hanson v. Denckla*, 357 U.S. 235, 251 (1958) ("*Hanson*").  "None of the trust assets has ever been held or administered in [Nevada]," and the Complaint fails to allege any "solicitation of business in that State either in person or by mail" by Delaware Charter.  *Id.*

Plaintiffs allege they "enter[ed] into a standardized form contract" with Delaware Charter, which created the trusts at the heart of their litigation.[29]  But the law is clear; "the mere existence of a contract with a party in the forum state does not constitute sufficient minimum contacts for jurisdiction."  *Sher*, 911 F.2d at 1362; *Boschetto v. Hansing*, 539 F.3d 1011, 1017 (9th Cir. 2008) ("the formation of a contract with a nonresident defendant is not, standing alone, sufficient to create jurisdiction" (citing *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 478 (1985) ("*Burger King*"))); *Doe v. Unocal Corp.*, 248 F.3d 915, 924 (9th Cir. 2001) ("*Doe*") ("However, an individual's contract with an out-of-state party alone [cannot] automatically establish sufficient minimum contacts to support personal jurisdiction." (internal quotation marks and citation omitted)).  Instead, the Court "must look to 'prior negotiations and contemplated future consequences, along with the terms of the contract and the parties' actual course of dealing' to determine if the defendant's contacts are 'substantial' and not merely 'random, fortuitous, or attenuated.'"  *Sher*, 911 F.2d at 1362 (quoting

---

[29] Complaint ¶ 15.

586480.1

1 *Burger King*, 471 U.S. at 479-80). Here, all of these factors weigh heavily against personal

2 jurisdiction over Delaware Charter in Nevada.

3       The terms rebut any suggestion Delaware Charter had substantial contact with Nevada. The

4 Trust Agreement was created in Delaware, not Nevada. The Trust Agreement itself states it "is

5 made pursuant to and shall be construed in accordance with the laws of the State of Delaware."

6 Trust Agreement § 5.8(K); *cf. Burger King*, 471 U.S. at 482 (observing a choice-of-law clause

7 indicated an acknowledgement that jurisdiction would arise in the chosen state). Additionally, the

8 "contemplated future consequences" lie in Delaware, not Nevada: "[a]ll contributions to [the] Trust

9 shall be deemed to take place in the State of Delaware."[30] "The cause of action in this case is not

10 one that arises out of an act done or transaction consummated in the forum State." *Hanson*, 357 U.S.

11 at 251; *see also Applied Underwriters, Inc. v. Combined Mgmt., Inc.*, 371 Fed. Appx. 834, 835 (9th

12 Cir. 2010) (refusing to find specific personal jurisdiction where "there is no evidence in the record

13 that the contract contemplated performance in [the forum state].").

14       Plaintiffs have failed to allege any contact between Delaware Charter and Nevada, much less

15 a "*substantial*" connection. *See Burger King*, 471 U.S. at 479. But even if Delaware Charter had

16 some interaction with Plaintiffs in Nevada, "phone calls and letters" sent to Nevada, "by themselves,

17 do not establish purposeful availment." *Sher*, 911 F.2d at 1362; *see also Applied Underwriters, Inc.*,

18 371 Fed. Appx. at 835 ("[O]rdinarily use of the mails, telephone, or other international

19 communication simply do not qualify as purposeful activity invoking the benefits and protection of

20 the [forum] state." (quoting *Roth v. Garcia Marquez*, 942 F.2d 617, 622 (9th Cir. 1991)

21 (modification in original))). "[T]his is not the deliberate creation of a 'substantial connection' with

22 [Nevada], nor is it the promotion of business within [Nevada]." *Sher*, 911 F.2d at 1362 (internal

23 citations omitted). Plaintiffs have failed to allege Delaware Charter "solicit[ed] [Plaintiffs'] business

24 in [Nevada]." *Id.* Therefore, "[t]here is no 'substantial connection'" with Nevada because Delaware

25 Charter undertook no "affirmative action to promote business within" Nevada. *Id.*

26

27

28 [30] Trust Agreement § 5.8(K).

586480.1

The sole connection between Nevada and the trust belongs to Plaintiffs, not Delaware Charter. But Plaintiffs' "contractual relations with [Delaware Charter] do not constitute purposeful availment of the benefits and protections of [Nevada] law" by *Delaware Charter*. *Doe*, 248 F.3d at 924. Instead, Plaintiffs' residence in Nevada is the type of "unilateral activity of those who claim some relationship with a nonresident defendant [that] cannot satisfy the requirement of contact with the forum State" necessary for this Court to exercise personal jurisdiction over Delaware Charter. *See Hanson*, 357 U.S. at 252; *Del Giorno v. W. Va. Bd. of Med.*, No. 2:12-cv-00095-KJD-VCF, 2012 WL 4753388, at *2 (D. Nev. Oct. 4, 2012) (rejecting "Plaintiff's only argument for jurisdiction" – "that somehow his presence in Nevada and the nature of this case confer jurisdiction on this Court" – as "an insufficient and unreasonable basis for the Court to exercise personal jurisdiction over the [defendant]").[31]

Because Plaintiffs have failed to allege, much less establish, Delaware Charter has sufficient minimum contacts with Nevada, this Court lacks personal jurisdiction over Delaware Charter. Plaintiffs' Complaint must be dismissed against Delaware Charter, under Federal Rule of Civil Procedure 12(b)(2).

## III. Plaintiffs Lack Article III Standing To Assert Claims Against Delaware Charter.

In a multi-defendant case, the plaintiff must allege the Article III standing requirements as to each defendant. *See, e.g.*, 1 Newberg on Class Actions § 2:5 (5th ed.); 1 J. McLaughlin, Class Actions § 4:28, at 659–60 (6th ed. 2010). As articulated by Chief Judge Pro, "to establish Article III standing in a class action, at least one named plaintiff must have standing in his own right to assert a claim against *each named defendant* before he may purport to represent a class claim against that defendant." *Henry v. Circus Circus Casinos, Inc.*, 223 F.R.D. 541, 544 (D. Nev. 2004) (emphasis added). If the named plaintiff does not have Article III standing against a particular defendant, then

---

[31] Because Plaintiffs did not – and cannot – carry their burden of establishing the first two prongs of specific personal jurisdiction, it is unnecessary for this Court to reach the third prong, whether it is reasonable to exercise personal jurisdiction over Delaware Charter. *See Core-Vent Corp. v. Nobel Indus. AB*, 11 F.3d 1482, 1487 (9th Cir. 1993). But even if Plaintiffs could satisfy their burden, the exercise of specific personal jurisdiction over Delaware Charter based on attenuated contacts with Nevada would be unreasonable. *See id.*

586480.1

that defendant must be dismissed based on lack of subject-matter jurisdiction. *See Audler v. CBC Innovis Inc.*, 519 F.3d 239, 245-48 (5th Cir. 2008) (holding that named plaintiff in class action lacked Article III standing to sue multiple defendants, with which he had not dealt, because those defendants "have caused [the named plaintiff] no cognizable injury" even though plaintiff had Article III standing against a separate defendant); *Easter v. Am. W. Fin.*, 381 F.3d 948, 961-62 (9th Cir. 2004) ("As to those trusts which have never held a named plaintiff's loan, Borrowers cannot allege a traceable injury and lack standing"); *Plumbers' Union Local No. 12 Pension Fund v. Nomura Asset Acceptance Corp.*, 632 F.3d 762, 771 (1st Cir. 2011) (dismissing certain trust defendants and other defendants connected to those trusts from which plaintiffs never purchased securities for lack of Article III standing); *Daughtery v. I-Flow, Inc.*, No. 3:09-CV-2120-P, 2010 WL 2034835, at *3 (N.D. Tex. Apr. 29, 2010) (class representative "must allege facts sufficient to establish that he suffered an injury that was caused by a particular defendant(s)' conduct.").[32]

As set forth in The Principal's motion to dismiss filed simultaneously herewith[33]: (1) Plaintiffs do not allege they suffered financial losses, adverse tax consequences or otherwise incurred actual injuries from "Principal's" alleged failure to provide them with an independent accounting, nor do Plaintiffs trace any alleged injury-in-fact specifically to Delaware Charter's conduct; (2) Plaintiffs fail to allege that "but for" the alleged agreement to conduct an independent accounting they would not have invested in the Apple REITS or, conversely, made an alternative

---

[32] *See also Newport v. Dell, Inc.*, No. CV-08-96, 2008 WL 4347017, at *2-3 (D. Ariz. Aug. 21, 2008) (plaintiff's standing to sue one defendant did not establish standing to sue co-defendants with which she had no contractual relationship); *Johnson v. GEICO Cas. Co.*, 673 F. Supp. 2d 244, 254 (D. Del. 2009) (holding that even with respect to affiliated defendants in a class action, standing must be shown for each defendant; ordering dismissal where two defendants were not alleged to have insured any of the named plaintiffs); *Cattie v. Wal–Mart Stores, Inc.*, 504 F. Supp. 2d 939, 944–46 (S.D. Cal. 2007) (plaintiffs lacked standing against one Wal–Mart entity where they relied solely on allegations it acted jointly with other Wal–Mart entities)*; In re Eaton Vance Corp. Sec. Litig.*, 220 F.R.D. 162, 169-171 (D. Mass. 2004) (reaffirming denial of standing to bring a class action suit against a mutual fund company in which the plaintiffs owned no shares but were under the control of the same corporate entity that controlled funds in which the plaintiffs did have an investment).
[33] The Principal has also filed a motion to dismiss based on Plaintiffs' lack of Article III standing. In order to avoid burdening this Court with duplicative briefing, Delaware Charter adopts and incorporates The Principal's Article III standing arguments as if set forth fully herein and merely summarizes those arguments here.

investment; and (3) Plaintiffs' Complaint gives no indication their undisclosed injury will somehow be redressed by a favorable decision against Delaware Charter in this action.[34]  Accordingly, because Plaintiffs have failed to meet every element of standing specifically as to Delaware Charter, Plaintiffs lack Article III standing to bring claims against Delaware Charter.  *See Easter*, 381 F.3d at 961-62; *Nat'l Org. for Women, Inc. v. Scheidler*, 510 U.S. 249, 255 (1994); *Cetacean Cmty. v. Bush*, 386 F.3d 1169, 1174 (9th Cir. 2004) ("A suit brought by a plaintiff without Article III standing is not a 'case or controversy,' and an Article III federal court therefore lacks subject matter jurisdiction over the suit."); *Lucas v. BMS Enter., Inc.*, No. 3:09-CV-2159-D, 2010 WL 2671305, at *2 (N.D. Tex. Jul. 1, 2010) ("[N]amed plaintiffs in a class action suit must meet every element of standing as to each defendant, including alleging that they were injured by each defendant named in the suit.").

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

---

[34] This is true, for among other reasons, because other courts have previously recognized it is virtually impossible for trustees, such as Delaware Charter, to reliably determine fair market value of investments like the Apple REITs. *See In Re Apple REITs Litig.*, No. 11-CV-2919 (KAM), 2013 WL 1386202, at *9-15 (E.D.N.Y. Apr. 3, 2013) (dismissing purported nationwide class action against Lerner Associates and Apple REITs because, *inter alia,* REITs' offering documents established and disclosed the share price was "established arbitrarily by (Apple REIT) and may not reflect the true value of the Units," "investors may be paying more for a Unit than the Unit is actually worth," and should not "assume that the per-Unit prices reflect the intrinsic or realizable value of the Units or otherwise reflect our value, earnings or other objective measures of worth," and  "investors will not have reliable information on the net fair value of the assets owned by [Apple REITs]." (emphasis omitted)).

586480.1

# CONCLUSION

The Forum Selection Clause requires dismissal of Plaintiffs' claims against Delaware Charter for *forum non conveniens*. This Court also lacks personal jurisdiction over Delaware Charter. Moreover, Plaintiffs also lack Article III standing to assert claims against Delaware Charter. Accordingly, Delaware Charter respectfully requests that this Court grant Delaware Charter's Motion to Dismiss Plaintiffs' Complaint.

DATED this 31st day of December, 2013

**WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP**

BY: /s/Sheri M. Thome
Sheri M. Thome, Esq.
Nevada Bar No. 008657
Chad C. Butterfield, Esq.
Nevada Bar No. 010532
300 S. Fourth Street, 11th Floor
Las Vegas, Nevada 89101
(702) 727-1400; FAX (702) 727-1401
sheri.thome@wilsonelser.com
chad.butterfield@wilsonelser.com
*Attorneys for Defendant Delaware Charter*
*Guarantee & Trust Company*

586480.1

**CERTIFICATE OF SERVICE**

Pursuant to FRCP 5(b), I certify that I am an employee of WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP, and that on this 31st day of December, 2013, I electronically filed and served a true and correct copy of the foregoing **DEFENDANT DELAWARE CHARTER GUARANTEE & TRUST COMPANY'S CORRECTED MOTION TO DISMISS** to all parties identified on file with the CM/ECF.

T. James Truman
T. JAMES TRUMAN & ASSOCIATES
3654 N. Rancho Drive
Las Vegas, NV 89130
district@trumanlegal.com

L. Timothy Fisher
Annick M. Persinger
BURSOR & FISHER, PA
1990 N. California Blvd., Ste 940
Walnut Creek, CA 94596
ltfisher@bursor.com
apersinger@bursor.com
*Attorneys for Plaintiffs*

Donald J. Campbell
J. Colby Williams
CAMPBELL & WILLIAMS
700 S 7th Street
Las Vegas, NV 89101
djc@cwlawlv.com
jcw@cwlaw.com

Michael D. Blanchard
BINGHAM McCUTHCHEN LLP
1 State Street
Hartford, CT 06103
michael.blanchard@bingham.com

Derek M. Care
Kenneth I. Schacter
BINGHAM McCUTCHEN LLP
399 Park Avenue
New York, NY 10022
derek.care@bingham.com
kenneth.schacter@bingham.com
*Attorneys for Defendant David Lerner Associates, Inc.*

By /s/Annemarie Gourley
An Employee of WILSON, ELSER, MOSKOWITZ, EDELMAN & DICKER LLP

586480.1

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEVADA

KEVIN and SUSAN LEWIS, on behalf of )
themselves and all other similarly situated, )

                                   )

               Plaintiffs,         )

                                   )

    vs.                            )

                                   )

DELAWARE CHARTER GUARANTEE )
& TRUST COMPANY D/B/A )
PRINCIPAL TRUST COMPANY, )
PRINCIPAL FINANCIAL GROUP, INC., )
and DAVID LERNER ASSOCIATES, )
INC., )

                                 )

             Defendants.      )

Case No: 2:13-CV-01809-GMN-(GWF)

## DECLARATION OF KRISTIN CAMP IN SUPPORT OF DEFENDANT DELAWARE CHARTER GUARANTEE & TRUST COMPANY D/B/A PRINCIPAL TRUST COMPANY'S MOTION TO DISMISS

1.  My name is Kristin Camp, and I am the Vice President of Operations of Delaware Charter Guarantee & Trust Company d/b/a Principal Trust Company ("Delaware Charter"). I have worked at Delaware Charter since 1999. The statements set forth in this Declaration are based upon my personal knowledge and information and records of the regularly conducted business activities of Delaware Charter. I am over 21 years of age and competent to testify to the statements set forth in this Declaration.

2.  I have reviewed the Complaint in this action and have familiarized myself with the allegations.

3.  Delaware Charter is incorporated under Delaware law. Delaware Charter maintains its corporate headquarters and principal place of business in Wilmington, Delaware.

4. Delaware Charter is a non-depository trust company that provides trust and administrative services for employee benefit plans and individual tax-advantaged accounts.

5. Delaware Charter is a subsidiary of Principal Financial Group, Inc.

6. Delaware Charter does not maintain offices in Nevada. Delaware Charter does not own, lease, rent, or control any real or personal property in Nevada. Delaware Charter does not employ agents in Nevada. Delaware Charter does not maintain any bank accounts in Nevada and does not pay Nevada state taxes.

7. The in-force Self-Directed Individual Retirement Trust Agreement ("Trust Agreement") applicable to plaintiffs Kevin Lewis and Susan Lewis is contained in "Application Booklets", as referenced in paragraph 17 of the Complaint. The Trust Agreement is attached hereto as Exhibit "A".

8. Delaware Charter's employees who provide services related to the IRAs referenced in the Complaint are located in Wilmington, Delaware. Likewise, all of the repositories for documents maintained by Delaware Charter related to the IRAs referenced in the Complaint are located in Wilmington, Delaware. Electronic information maintained by Delaware Charter about the IRAs is centralized in and accessible from Delaware Charter's headquarters in Wilmington.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed this 20 day of December 2013 in Wilmington, Delaware.

Kristin Camp

# EXHIBIT A

# EXHIBIT A

Principal Trust Company

*A member of*



Mailing Address:
P.O. Box 8963
Wilmington, DE 19899-8963
800-209-9010    Fax: 302-999-9554

*Self-Directed*
*Individual Retirement*
*Trust Agreement*

## Article I
### Introduction

The purpose of this Trust is to establish a Traditional IRA under Internal Revenue Code ("Code") Section 408(a) or a Roth IRA under Code Section 408A to provide benefits for an individual or their beneficiaries upon their retirement, disability, or death. At no time shall the account be operated as both a Roth IRA and a Traditional IRA.

## Article II
### Definitions

As used in both the Traditional IRA and Roth IRA Self-Directed Individual Retirement Trust Agreement, the following terms shall have the meanings set forth below, unless a different meaning is plainly required by the context:

2.1    **Act** means the Employee Retirement Income Security Act of 1974, as amended.

2.2    **Account Holder** means the individual whose name appears on the Trustee accepted application and for whom contributions have been received by this Trust.

2.3    **Application** means the Application through which the Account Holder adopts this Trust, as may be amended from time to time, and thereby agrees to be bound by all terms and conditions of this Agreement.

2.4    **Beneficiary** means the person(s) or entity (entities) properly designated by the Account Holder in the Application or in a form acceptable to the Trustee.

2.5    **Brokerage Firm** means the investment agent selected in the application or through other means acceptable to the Trustee.

2.6    **Code** means the Internal Revenue Code of 1986, as amended.

2.7    **Compensation** means wages, salaries, professional fees, or other amounts derived from or received for personal services actually rendered. This includes but is not limited to commissions paid salespersons, compensation for services on the basis of a percentage of profits, commissions on insurance premiums, tips, and bonuses. It also includes earned income, as defined in Code Section 401(c)(2) (reduced by the deduction the self-employed individual takes for contributions made to a self-employed retirement plan). For purposes of this definition, Code Section 401(c)(2) shall be applied as if the term trade or business, for purposes of Code Section 1402 included service described in subsection (c)(6). Compensation does not include amounts derived from or received as earnings or profits from property (including but not limited to interest and dividends) or amounts not includible in gross income. Compensation also does not include any amount received as a pension or annuity or as deferred compensation. Compensation does include any amount includible in the Account Holder's gross income under Code Section 71 with respect to a divorce or separation instrument described in subparagraph (A) of Section 71(b)(2).

   With respect to Roth IRAs, in the case of a married individual filing a joint return, the greater compensation of his or her spouse is treated as his or her own compensation, but only to the extent that such spouse's compensation is not being used for purposes of the spouse making a contribution to a Roth IRA or a deductible contribution to a non-Roth IRA.

2.8    **Conversion Contribution** means a rollover contribution described in Section 408(d) of the Code from a Traditional IRA, SEP, or SIMPLE IRA to a Roth IRA.

2.9    **Designated Beneficiary** means the beneficiary whose life expectancy is used to determine the amount of the required distribution, in accordance with Code Section 408(a)(6) and Treasury Regulation Section 1.408-8.

2.10    **Disability** means the Account Holder's inability to engage in any substantial, gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or to be of a long-continued and indefinite duration and as further described in Code Section 72(m)(7).

2.11 **Individual Retirement Account** means an account established under section 408(a) of the Code.

2.12 **Internal Revenue Service (IRS)** means the agency responsible for administering and enforcing internal revenue laws, determination of pension plan qualification and exempt organization status, preparation and issuance of ruling and regulations to interpret the provisions of the Internal Revenue Code, and other responsibilities.

2.13 **Modified Adjusted Gross Income (MAGI)** means income as defined in Code Section 408A(c)(3)(C)(i) and does not include any amount included in adjusted gross income as a result of a rollover from a non-Roth IRA (a conversion).

2.14 **Recharacterization** means treating a contribution made to one IRA as having been made to a different type of IRA.

2.15 **Reconversion** means recharacterizing a conversion contribution as a contribution to a Traditional IRA, then converting the Traditional IRA to a Roth IRA again. Conversions can be reconverted one time during the calendar year during which they were made.

2.16 **Regulations** mean Federal Income Tax regulations, as amended from time to time.

2.17 **Required Beginning Date** means the date at which payments must be made from the account.

2.18 **Roth IRA** means an individual retirement account as defined in Section 408A of the Code.

2.19 **Spousal IRA** means an IRA funded by a married taxpayer for his or her spouse if the taxable compensation of the non-working spouse is less than that of the working spouse and the taxpayer files a joint return.

2.20 **SIMPLE** means a Savings Incentive Match Plan for Employees as defined in Section 408(p) of the Code.

2.21 **SEP** means a Simplified Employee Pension as defined in Sections 408(j) and 408(k) of the Code.

2.22 **Traditional IRA** means an IRA as defined in Section 408(a) of the Code.

2.23 **Trust Year** is the calendar year from January first (1st) to December thirty-first (31st).

2.24 **Trustee** means the Delaware Charter Guarantee & Trust Company d/b/a Principal Trust Company (Principal Trust Company) and any successor Trustee under the trust.

2.25 **Trust** means this Trust established hereunder as it may be amended from time to time, including the Application, which is part of the Trust.

2.26 **Trust Agreement** means this document which establishes and sets forth the material terms of the Self-Directed Individual Retirement Trust Agreement.

## Article III
## Roth IRAs

The references to IRAs in this Article refer only to Roth IRAs unless noted otherwise.

3.1 **Eligibility**

A. An eligible individual is any person who received compensation for services (including earned income of a self-employed individual) during the taxable year and has a modified adjusted gross income (MAGI) which is less than the amount allowed for their filing status for purposes of contributing to a Roth IRA.

B. As a condition of participation, the Account Holder is required to consent to the terms and conditions of this Trust, as may be amended from time to time. Agreement need not be in writing.

3.2 **Contributions**

A. Each taxable year, the Account Holder may contribute on a periodic basis to this Trust an amount not to exceed the lesser of three thousand dollars ($3,000) or one-hundred percent (100%) of compensation, or the applicable statutory limit. A qualified rollover contribution or recharacterization (as described in Section 3.3 and 3.4 does not apply toward the contribution limit).

If the Account Holder is under age 50, the applicable amount is $3,000 for any taxable year beginning in 2002 through 2004, $4,000 for any taxable year beginning in 2005 through 2007 and $5,000 for any taxable year beginning in 2008 and years thereafter.

If the Account Holder is 50 or older, the applicable amount is $3,500 for any taxable year beginning in 2002 through 2004, $4,500 for any taxable year beginning in 2005 through 2007 and $6,000 for any taxable year beginning 2008 and years thereafter.

After 2008, the limits in the paragraphs above will be adjusted by the Secretary of the Treasury for cost-of-living increases under Code Section 219(b)(5)(C). Such adjustments will be in multiples of $500.

B. The contribution limit is reduced if the Account Holder's filing status is:

C. Married filing a joint return *and* the MAGI is between $150,000 and $160,000.

D. Married filing separately and the Account Holder and spouse lived together during the year *and* the MAGI is between $0 and $10,000.

E. Single, head of household or married filing separately and the Account Holder did not live with their spouse at any time during the year *and* the MAGI is between $95,000 and $110,000.

F. If the Account Holder's contribution limit is reduced because of MAGI the maximum regulation contribution is rounded up to the next $10. If the contribution limit is greater than $0, but less than $200, the amount is rounded up to $200.

G. Contributions to this Roth IRA are also reduced by the amount of contributions made to a Traditional IRA.

H. For purposes of Sections 3.1(A) above, MAGI has the same meaning as defined in Code Section 408A(c)(3)(C)(i). MAGI does not include amounts includible in Adjusted Gross Income because of a conversion from a Traditional IRA.

I. A regular contribution to a Traditional IRA or a SIMPLE plan may be recharacterized as a regular contribution to this Roth IRA subject to the terms and limitations in Treasury Regulation Section 1.408A-5 and Section 3.4 below.

J. No amounts made under a SIMPLE plan established by an employer under Code Section 408(p) or a SEP established by an employer under Code Section 408(j) or (k) will be accepted into this Trust.

K. No amounts attributable to an employer contribution to a SIMPLE plan can be converted to a Roth IRA during the 2-year period beginning on the date the Account Holder first participated in the SIMPLE.

L. Contributions may be made after age 70½.

3.3 Rollovers

A. This Trust will accept rollovers from other Roth IRAs provided they are deposited within 60 days of the date distributed from the previous Roth IRA as permitted under applicable laws. A qualified rollover is one that meets the requirements of Section 408(d)(3) of the Code, except the one rollover per twelve consecutive months rule does not apply if the rollover is from an IRA other than a Roth IRA.

B. Rollover Contributions from a non-Roth IRA cannot be made if:

   • You and your spouse's MAGI is more than $100,000,

   • You are married and filing a separate return, or

   • You are not married and your MAGI is in excess of $100,000

   The $100,000 limit shall apply in the year that the assets are distributed from the Traditional IRA and not the date they are deposited into the Roth IRA. For the purposes of this Section 3.3 (B), a husband and wife are not treated as married for a taxable year if they have lived apart at all times during that taxable year and file separate returns for that taxable year.

C. Conversion amounts must be qualified rollover contributions under Code Section 408A(e), and therefore, must satisfy Code Section 408(d)(3).

D. Any amount converted from a non-Roth IRA to a Roth IRA will be treated as a distribution from the non-Roth IRA and a rollover to the Roth IRA regardless of the actual means by which the assets are converted.

E. Amounts held in a SEP or SIMPLE plan may be converted. In the case of a SIMPLE plan, the conversion may be done only after the expiration of the two-year period as described in Code Section 72(t)(6). No SEP or SIMPLE contributions can be made to a Roth IRA. Amounts held in retirement plans other than IRAs cannot be converted directly to a Roth IRA.

3.4 Recharacterizations

  A. On or before the due date for filing taxes, plus extensions, an Account Holder may recharacterize IRA contributions, including Roth IRA Conversion Contributions by means of a Trustee transfer. Recharacterized amounts will be treated as if they were made to the transferee plan and not the transferor plan if such recharacterizations are made in compliance with Code Section 408A(d)(6), Treasury Regulation Section 1.408A-5, and other applicable laws or regulations.

  B. **Beginning January 1, 2000,** amounts that are transferred from a Traditional IRA to a Roth IRA by means of a recharacterization may not be converted before the later of the beginning of the taxable year following the taxable year in which the amount was converted to a Roth IRA or the end of the 30-day period beginning on the day on which the Account Holder recharacterizes the amount from the Roth IRA back to the Traditional IRA.

    A Reconversion made before the later of the beginning of the next taxable year or the end of the 30-day period is treated as a failed Reconversion. For this purpose only, a failed Conversion Contribution that is the result of a failure to satisfy the statutory requirements for a Conversion contribution is treated as a Conversion contribution in determining when the Account Holder can make a Reconversion.

3.5 Distributions

  A. The Account Holder is not required to take distributions from his or her Roth IRA during their lifetime. The Beneficiary must take distributions as outlined in Paragraphs F through K of this Section 3.5.

  B. Distributions that are not included in income are:

    • Qualified distributions,

    • Due to return of excess,

    • Rolled over to another Roth IRA.

    A qualified distribution is a distribution of assets that have been in the account for five years and:

    • Made on or after the date you reach age 59½,

    • Made because you are disabled,

    • Made to a beneficiary or your estate after your death, or

    • Meets the requirements for the purchase of a first home.

  C. Withdrawals of excess contributions and the earnings on them before the due date of your tax return (including extensions) are not qualified distributions. The earnings are taxable in the year for which the contribution was made and may be subject to a 10 percent early distribution penalty.

  D. Distributions that are not qualified distributions may be partially taxable. The tax treatment of these withdrawals and the earnings thereon must be withdrawn according to the order and aggregation rules as outlined in Code Section 408A(d)(F)(4).

  E. The taxable portion of other withdrawals that are not qualified distributions are subject to the additional tax on premature distributions, unless one of the exceptions applies.

  F. Upon the death of the Account Holder, his or her entire interest will be distributed at least as rapidly as follows:

    1. If the designated Beneficiary is someone other than the Account Holder's surviving spouse, the entire interest will be distributed, starting by December 31 of the calendar year following the calendar year of the Account Holder's death, over the remaining life expectancy of the designated Beneficiary, with such life expectancy determined using the age of the Beneficiary as of his or her birthday in the year following the year of the Account Holder's death, or, if elected, in accordance with paragraph F.3 below.

    2. If the Account Holder's sole designated Beneficiary is the Account Holder's surviving spouse, the entire interest will be distributed, starting by December 31 of the calendar year following the calendar year of the Account Holder's death (or by December 31 of the calendar year in which the Account Holder would have attained age 70½, if later), over such spouse's life, or, if elected, in accordance with paragraph F.3 below. If the surviving spouse dies before distributions are required to begin, the remaining interest will be distributed, starting by the end of the calendar year following the calendar year of the spouse's death, over the spouse's designated Beneficiary's remaining life expectancy determined using such Beneficiary's age as of his or her birthday in the year following the death of the spouse, or, if elected, will be distributed in accordance with paragraph F.3 below. If the surviving spouse dies after distributions are required to begin, any remaining interest will be distributed over the spouse's remaining life expectancy determined using the spouse's age as of his or her birthday in the year of the spouse's death.

3. If there is no designated Beneficiary, or if applicable by operation of paragraph F.1 or F.2 above, the entire interest will be distributed by December 31 of the calendar year containing the fifth anniversary of the Account Holder's death (or of the spouse's death in the case of the surviving spouse's death before distributions are required to begin under paragraph F.2 above).

4. The amount to be distributed each year under paragraph F.1 or F.2 is the quotient obtained by dividing the value of the Roth IRA as of the end of the preceding year by the remaining life expectancy specified in such paragraph. Life expectancy is determined using the Single Life Table in Q&A-1 of Section 1.401(a)(9)-9 of the Treasury Regulations. If distributions are being made to a surviving spouse as the sole designated Beneficiary, such spouse's remaining life expectancy for a year is the number in the Single Life Table corresponding to such spouse's age in the year. In all other cases, remaining life expectancy for a year is the number in the Single Life Table corresponding to the Beneficiary's age in the year specified in paragraph F.1 or F.2 and reduced by 1 for each subsequent year.

5. The value of the Roth IRA includes the amount of any outstanding rollover, transfer, and recharacterization under Q&As-7 and −8 of Section 1.408-8 of the Treasury Regulations.

G. If the Beneficiary has not made an election by December 31 of the year following the year of the Account Holder's death, the Trustee reserves the right to distribute the assets in any one of the following ways:

- Pay the entire value of the account to the Beneficiary in a lump sum, or

- Pay the entire value of the account by December 31 of the fifth year following the year of the Account Holder's death, or

- Pay the amount over the life expectancy of the Beneficiary.

In the case of a payment made over the Beneficiary's life expectancy, the amount shall be figured using the Beneficiary's age on December 31 of the year distributions will begin and using the fair market value of the account on December 31 of the year prior to the year distributions will begin. Life expectancy shall be determined using the Single Life Table in Q&A-1 of Section 1.401(a)(9)-9 of the Treasury Regulations. If the Beneficiary is the Account Holder's spouse, the life expectancy will be recalculated and is irrevocable when payment has been made.

H. If a distribution to a Beneficiary is not a qualified distribution, it is generally included in the Beneficiary's income in the same manner as a distribution to the Account Holder when the Account Holder was alive (See Section 3.5(D) above).

I. Distributions from other Roth IRAs cannot be substituted for payments from this Roth IRA unless the other IRA was inherited from the same decedent.

J. If the Account Holder had converted funds to which four-year averaging applies and such Account Holder dies before all such amounts have been included in income, the Beneficiary will include all remaining amounts in gross income for the taxable year that includes the Account Holder's date of death.

K. If the sole Beneficiary of the account is the Account Holder's spouse, the account will be treated as if the surviving spouse elected to treat it as his or her own in the event that the surviving spouse fails to take a distribution by the required time or makes a contribution, rollover, or conversion to the account.

## Article IV

### Traditional IRAs

References to IRAs in this Article refer only to Traditional IRAs unless noted otherwise.

4.1 Eligibility

A. An eligible individual is any person who received Compensation for services (including earned income of a self-employed individual) during the taxable year and is under age 70½. An individual making a rollover contribution (as permitted by Code Sections 402(c), 402(e)(6), 403(a)(4), 403(b)(8), 403(b)(10), 408(d)(3), and 457(e)(16) or an employer contribution to a Simplified Employee Pension as defined in Code Section 408(k) is also an eligible individual.

B. As a condition of participation, the Account Holder will be required to consent to the terms and conditions of this Trust, as may be amended from time to time. Consent need not be in writing.

## 4.2 Contributions

A. Except in the case of a rollover contribution as described in Code Section(s) 402(c), 402(e)(6), 403(a)(4), 403(b)(8), 403(b)(10), 408(d)(3), and 457(e)(16) or an employer contribution to a SEP as described in Code Section 408(k), no contributions will be accepted unless they are in cash, and the total of such contributions does not exceed $3,000 for any taxable year beginning in 2002 through 2004; $4,000 for any taxable year beginning in 2005 through 2007; and $5,000 for any taxable year beginning in 2008 and years thereafter.

After 2008, the limit will be adjusted by the Secretary of the Treasury for cost-of-living increases under Code Section 219(b)(5)(C). Such adjustments will be in multiples of $500.

In the case of an individual who is 50 or older, the annual cash contribution limit is increased by $500 for any taxable year beginning in 2002 through 2005 and $1,000 for any taxable year beginning in 2006 and years thereafter.

In the case of a SEP contribution, the amount cannot exceed the lesser of 25 percent of compensation, or $40,000 or such limits as prescribed by law. In general, you cannot consider the part of an employee's compensation that exceeds the statutory limit as adjusted when figuring the contribution limit for that employee. That means the contribution amount for an employee subject to the $200,000 compensation cap is $40,000.

No contributions will be accepted under a SIMPLE IRA Plan established by any employer pursuant to Code Section 408(p). Also, no transfer or rollover of funds attributable to contributions made by a particular employer under its SIMPLE IRA Plan will be accepted from a SIMPLE IRA, that is, an IRA used in conjunction with a SIMPLE IRA Plan, prior to the expiration of the 2-year period beginning on the date the employee first participated in that employer's SIMPLE IRA Plan.

B. No contributions can be made to this Trust in or after the taxable year during which the Account Holder reaches age 70½.

## 4.3 Rollovers

A. The Trustee may accept additional cash contributions on behalf of the Account Holder for a tax year of the Account Holder. The total cash contributions are limited as described in Section 4.2 above unless the contribution is a rollover as described in Code Sections 402(c) (but only after December 31, 1992) 402(e)(6), 403(a), 403(b)(8), 403(b)(10), 408(d)(3), and 457(e)(16) or an employer contribution to a SEP described in Code Section 408(k).

B. If this Trust or an employee's IRA forming part of the employer's retirement trust has been disqualified because the individual and/or the Beneficiary engaged in a prohibited transaction as defined in Section 406 of the Act, then such employee's account may not be rolled over to another IRA.

C. Only cash or property from a plan as described above may be rolled over from such plan to this Trust.

## 4.4 Distributions

A. Amounts distributed from a Traditional IRA and not rolled over into another trust as described in Code Section 408(d)(3), are subject to a 10 percent non-deductible penalty tax as described in Code Section 72(t)(2).

There are exceptions to the tax as described in Code Section 72(t)(2)(a). Those exceptions are distributions that are made:

- After attainment of age 59½,
- After the death of the Account Holder,
- Due to disability as defined in Code Section 72(m)(7),
- As part of a series of substantially equal and periodic payments that are not less frequently than annually and made over the life expectancy of the Account Holder or the Account Holder and their Beneficiary,
- Due to dividends paid by a corporation described in Code Section 404(k)
- On account of a levy under Code Section 6331
- Distributions made under Code Section 72(t)(2)(B) (certain medical expenses), Code Section 72(t)(2)(C) (qualified domestic relation orders), and 72(t)(2)(D) (distributions to unemployed individuals for health insurance premiums) may be exempt from the ten percent (10%) penalty.

B. Notwithstanding any provision of this Trust Agreement to the contrary, the distribution of an Account Holder's interest will be made in accordance with the minimum distribution requirements of Code Sections 408(a)(6) or 408(b)(3) and the regulations thereunder, including the incidental death benefit provision of Treasury Regulation Section 1.401(a)(9)-2 which is herein incorporated by reference. If distributions are made from an annuity contract purchased from an insurance company, distributions thereunder must satisfy the requirements of Q&A-4 of Section 1.409(a)(9)-6T of the Temporary Treasury Regulations, rather than sections C, E, and K below.

C. The Account Holder's entire interest in the Traditional IRA must be distributed or begin to be distributed by the Account Holder's Required Beginning Date (which is April 1 of the year following the calendar year in which the Account Holder reaches age 70½) and over the life of such Account Holder or the lives of such Account Holder and his or her designated Beneficiary. A distribution must be made on or before December 31 for each succeeding year.

D. The Account Holder may elect to receive a distribution of the balance of the Trust at any time, upon written notice to the Trustee. This is true even if distributions have begun in accordance with one of the above options.

E. The amount that must be distributed each year, beginning with the calendar year for which distributions are required and continuing through the year of death, is obtained by dividing the IRA account balance on December 31 of the previous year by the distribution period in the Uniform Lifetime Table in Q&A-2 of Section 1.401(a)(9)-9 of the Treasury Regulations, using the Account Holder's age as of his or her birthday in the year. However, if the Account Holder's sole designated Beneficiary is his or her surviving spouse and such spouse is more than 10 years younger than the Account Holder, then the distribution period is determined under the Joint and Last Survivor Table in Q&A-3 of Section 1401(a)(9)-9 using the ages as of the Account Holder's and spouse's birthdays in the year.

F. If in any taxable year after the Account Holder turns age 70½ and fails to withdraw the required minimum distribution from the IRA, a 50 percent non-deductible penalty may be imposed by the IRS on the difference between the amount that should have been distributed and the amount actually distributed.

G. If an Account Holder has multiple IRAs, then the Account Holder must determine the required minimum distribution amount for each IRA, however the minimum amounts can be totaled together and the total taken from any one or more of the IRAs in accordance with Q&A-8 of section 1.408-8 of the Treasury Regulations.

H. If the Account Holder fails to receive any of the distributions described above before the first day of April following the calendar year in which the age of 70½ is reached, then the Trustee reserves the right to pay out the balance of the account in a single sum payment.

I. Distributions in excess of the required minimum payment cannot be used as a credit when figuring a subsequent year's required minimum distribution.

J. Life expectancy is determined in accordance with section 4.4E above. If the Account Holder fails to make an election by the time distributions are required to begin, life expectancy will be recalculated annually. Such elections will be irrevocable by the Account Holder and will apply to all subsequent years. The life expectancy of a non-spouse Beneficiary may not be recalculated. Instead, life expectancy will be calculated using the attained age of such Beneficiary during the calendar year in which the Account Holder attains age 70½. Payments for subsequent years will be calculated based on such life expectancy reduced by one for each calendar year that has elapsed since the calendar year life expectancy was first calculated.

K. If the Account Holder dies before the entire interest in the IRA is distributed, the remaining interest will be distributed as follows:

    a. Death on or after Required Beginning Date: If the Account Holder dies on or after the Required Beginning Date, the remaining portion of his or her interest will be distributed as least as rapidly as follows:

        1. If the designated Beneficiary is someone other than the Account Holder's surviving spouse, the remaining interest will be distributed over the remaining life expectancy of the designated Beneficiary, with such life expectancy determined using the Beneficiary's age as of his or her birthday in the year following the year of the Account Holder's death, or over the period described in paragraph (a)(3) below if longer.

        2. If the Account Holder's sole designated Beneficiary is the Account Holder's surviving spouse, the remaining interest will be distributed over such spouse's life or over the period described in paragraph (a)(3) below if longer. Any interest remaining after such spouse's death will be distributed over such spouse's remaining life expectancy using the spouse's age as of his or her birthday in the year of the spouse's death, or, if the distributions are being made over the period described in paragraph (a)(3) below, over such period.

3   If there is no designated Beneficiary, or if applicable by operation of paragraph (a)(1) or (a)(2) above, the remaining interest will be distributed over the Account Holder's remaining life expectancy determined in the year of the Account Holder's death.

4.  The amount to be distributed each year under paragraphs (a)(1), (2), or (3), beginning with the calendar year following the calendar year of the Account Holder's death, is the quotient obtained by dividing the value of the IRA as of December 31 of the preceding year by the remaining life expectancy specified in such paragraph. Life expectancy is determined using the Single Life Table in Q&A-1 of Section 1.401(a)(9)-9 of the Treasury Regulations. If distributions are being made to a surviving spouse as the sole designated Beneficiary, such spouse's remaining life expectancy for a year is the number in the Single Life Table corresponding to such spouse's age in the year. In all other cases, remaining life expectancy for a year is the number in the Single Life Table corresponding to the Beneficiary's or Account Holder's age in the year specified in paragraphs (a)(1), (2), or (3) and reduced by 1 for each subsequent year.

b.  Death before Required Beginning Date: If the Account Holder dies before the Required Beginning Date, the entire remaining interest must be distributed at least as rapidly as follows:

1.  If the designated Beneficiary is someone other than the Account Holder's surviving spouse, the entire interest will be distributed, starting by December 31 of the calendar year following the year of the Account Holder's death, over the remaining life expectancy of the designated Beneficiary, with such life expectancy determined using the age of the Beneficiary as of his or her birthday in the year following the year of the Account Holder's death, or, if elected, in accordance with paragraph (b)(3) below.

2.  If the Account Holder's sole designated beneficiary is the Account Holder's surviving spouse, the entire interest will be distributed, starting by December 31 of the calendar year following the calendar year of the Account Holder's death (or by December 31 of the calendar year in which the Account Holder would have attained age 70½ if later), over such spouse's life, or, if elected, in accordance with paragraph (b)(3) below. If the surviving spouse dies before distributions are required to begin, the remaining interest will be distributed, starting by December 31 of the calendar year following the calendar year of the spouse's death, over the spouse's designated Beneficiary's remaining life expectancy determined using such Beneficiary's age as of his or her birthday in the year following the death of the spouse, or, if elected, will be distributed in accordance with paragraph (b)(3) below. If the surviving spouse dies after distributions are required to begin, any remaining interest will be distributed over the spouse's remaining life expectancy determined using the spouse's age as of his or her birthday in the year of the spouse's death.

3.  If there is no designated Beneficiary, or if applicable by operation of paragraph (b)(1) or (b)(2) above, the entire interest will be distributed by December 31 of the calendar year containing the fifth anniversary of the Account Holder's death (or of the spouse's death in the case of the surviving spouse's death before distributions are required to begin under paragraph (b)(2) above).

4.  The amount to be distributed each year under paragraph (b)(1) or (2) is the quotient obtained by dividing the value of the IRA as of December 31 of the preceding year by the remaining life expectancy specified in such paragraph. Life expectancy is determined using the Single Life Table in Q&A-1 of Section 1.401(a)(9)-9 of the Treasury Regulations. If distributions are being made to a surviving spouse as the sole designated Beneficiary, such spouse's remaining life expectancy for a year is the number in the Single Life Table corresponding to such spouse's age in the year. In other cases, remaining life expectancy for a year is the number in the Single Life Table corresponding to the Beneficiary's age in the year specified in paragraph (b)(1) or (2) and reduced by 1 for each subsequent year.

c.  The value of the IRA includes the amount of any outstanding rollover, transfer, and recharacterization under Q&As-7 and –8 of section 1.408-8 of the Treasury Regulations.

d.  If the sole designated Beneficiary is the Account Holder's surviving spouse, the spouse may elect to treat the IRA as his or her own IRA. This election will be deemed to have been made if such surviving spouse makes a contribution to the IRA or fails to take required distributions as a Beneficiary.

L. If the Beneficiary has not made an election by December 31 of the year following the year of the Account Holder's death, the Trustee reserves the right to distribute the assets in any one of the following ways:

- Pay the entire value of the account to the Beneficiary in a lump sum, or

- Pay the entire value of the account by December 31 of the fifth year following the year of the Account Holder's death, or

- Pay the amount over the life expectancy of the Beneficiary.

In the case of a payment made over the Beneficiary's life expectancy, the amount shall be figured using the Beneficiary's age on December 31 of the year distributions will begin and using the fair market value of the account on December 31 of the year prior to the year distributions will begin. If the Beneficiary is the Account Holder's spouse, the life expectancy will be recalculated and is irrevocable when payment has been made.

M. Distributions under these Paragraphs B through M are considered to have begun if the distributions are made because the Account Holder has reached his or her Required Beginning Date. If the Account Holder received distributions before the Required Beginning Date and the Account Holder dies, distributions will not be considered to have begun.

## Article V
### Traditional and Roth IRAs

The following provisions apply to both Traditional IRAs and Roth IRAs

5.1 Contributions

A. Contributions must be made in cash. The Account Holder will specify the investment to be made for all such contributions. All contributions received, together with the income therefrom, and any other increment thereon will be held, and administered by the Trustee pursuant to the terms of this Trust without distinction between principal and income and without liability for the payment of interest thereon. The Trustee will not be responsible for the computation and collection of any contributions under the Trust and will be under no duty to determine whether the amount of any contributions is in accordance with the Trust.

B. Except in the case of a rollover contribution as described in Sections 3.3 (Roth IRA) and 4.3, (Traditional IRA), Conversion Contributions as described in Section 3.2 and Recharacterizations as described in Section 3.4, the Trustee will accept only cash and will not accept contributions on behalf of the Account Holder in excess of $3,000 or such limits as may be prescribed by law for any taxable year. In the case of a SEP as described in Code Section 408(k), the Trustee will not accept employer contributions on behalf of the Account Holder in excess of $40,000 or such limits as may be prescribed by law for that taxable year.

C. Contributions made to this Trust by the Account Holder will be made to, or for the account, not later than April 15 of the year following the year to which the contribution relates. Contributions by an employer to a SEP must be made no later than three and one half months after the close of the Trust year.

D. Contributions made to this Trust by or for the Account Holder will be fully vested and nonforfeitable at all times. Neither the Account Holder nor the Beneficiary may pledge, sell, or transfer any part of the account, except as provided by law and this Trust Agreement.

E. The Account Holder will direct the Trustee with respect to the investment of all contributions and the earnings thereon under the Trust. Such direction will be limited to securities obtainable through the brokerage firm designated in the Application (or any other stockbroker selected by the Account Holder and approved by the Trustee) for reinvestment in accordance with the instructions of the Account Holder. Notwithstanding the above, the Account Holder may direct contributions and earnings to be placed in a savings account or a Certificate of Deposit with an institution approved by the Trustee. The Trustee in its discretion reserves the right to return contributions received without the proper investment instructions to the payer or deposit such contributions to a money market account of the Trustee's choice. See Section 5.5 below for Investments and Administration.

F. If the Account Holder makes a contribution to this Trust which exceeds the lesser of one hundred percent (100%) of compensation or three thousand dollars ($3,000), or the lesser of twenty five percent (25%) of compensation or forty thousand dollars ($40,000) if a SEP, or such limits as may be prescribed by law and it is deemed that any portion of such contribution which exceeds these limits is not deductible for federal income tax purposes, then the non-deductible portion may be withdrawn by the Account Holder. Such withdrawal must be made prior to the date on which the Account Holder is required to file his or her federal income tax return.

G. Any income earned on the non-deductible portion of such contributions must be withdrawn by the Account Holder at the same time as indicated in paragraph F, above.

5.2 Rollovers

A. Partial rollovers from this Trust to another IRA meeting the requirements of Code Section 408(a) or to an Annuity contract meeting the requirements of Code Section 408(b), or a Roth IRA meeting the requirements of Code Section 408A, are permitted to be made once a year.

B. The Account Holder may rollover or transfer the entire interest to another Individual Retirement Trust meeting the requirements of Code Section 408(a) or to an Annuity contract meeting the requirements of Code Section 408(b), or a Roth IRA meeting the requirements of Code Section 408A.

C. The above described rollover(s) must be completed within sixty (60) days after the day on which the Account Holder receives the payment or distribution of last asset in the account or in such time frames as prescribed by law.

5.3 Distributions

A. Subject to, and in accordance with other provisions in this Trust, the Trustee will from time to time on the written directions of the Account Holder make distributions out of the Trust to such individuals, in such manner, in such amounts, and for such purposes as may be specified in such written directions.

B. The Trustee will not be liable for the proper application of any part of the Trust if distributions are made in accordance with the written directions of the Account Holder as herein provided, nor will the Trustee be responsible for the adequacy of the Trust to meet and discharge any and all distributions and liabilities.

C. All requests for withdrawals will be in writing and in a form acceptable to the Trustee. A withholding election and the tax identification number of the recipient will be provided to the Trustee before the Trustee makes a payment. All payments are subject to applicable taxes and penalties. If no withholding election is provided to the Trustee, taxes will be withheld in accordance with applicable laws.

D. The Account Holder may transfer his or her interest in whole or in part, under a divorce decree, dissolution of marriage, or a written instrument incident to such divorce or dissolution. The Account Holder shall promptly notify the Trustee of such transfer by providing a certified copy of such decree or true copy of such written instrument to the Trustee.

5.4 Designation of Beneficiary

A. The Account Holder shall designate a Beneficiary on the IRA application. The Account Holder may change the Beneficiary designation by filing a written notice with the Trustee in such manner as the Trustee deems acceptable. Changes to the Beneficiary designation must be received by the Trustee during the Account Holder's lifetime and are considered valid when they have been received by the Trustee.

B. The Designated Beneficiary will be entitled to the Account Holder's entire interest in the event of the Account Holder's death before the complete distribution of the entire interest.

C. Unless the Account Holder designates in writing how distributions are to be paid, the interest in the account will be paid equally to all primary Beneficiaries, or contingent Beneficiaries if all primary Beneficiaries have died before the Account Holder.

D. If the designation of a Beneficiary has not been made by the Account Holder at the time of the Account Holder's death, the Beneficiary shall be the spouse of the Account Holder, or if there is no spouse living at the time of the Account Holder's death, the Beneficiary will be the estate of the Account Holder.

E. If the Beneficiary designated to receive payments is a minor child or declared incapacitated or incompetent by the court, the Trustee may make such payment to a court appointed guardian or legally appointed representative. The receipt of such payment by such individual shall be a full and complete discharge to the Trustee for any sums so paid.

F. If the Trustee is unable to make a payment to a Beneficiary within six months after any such payment is due because the Trustee cannot ascertain the whereabouts or the identity of the Beneficiary by mailing to the last known address shown on the Trustee's records and such Beneficiary has not written claim for such payment before the expiration of said six-month period, then the Trustee may deposit the Beneficiary's funds in a savings account or money market mutual fund established in the name of the Beneficiary.

G. Upon the death of the Account Holder, the Beneficiary may designate his or her own Beneficiary to receive any remaining assets in the account in the event the Beneficiary dies before a total distribution of the interest in the account occurs. Payments to the Beneficiary's Beneficiary must continue at least as rapidly as they would have been to the original Beneficiary.

H. A designated Beneficiary may disclaim his or her interest in the account provided the disclaimer is in a form acceptable to the Trustee and complies with Code Section 2518(b).

I. A Beneficiary is responsible for paying any fees, expenses, or taxes of the Trust in the same manner and time frame as if they were the original Account Holder.

J. If the designated Beneficiary of the account is the spouse and a partial transfer of the account is effected under Section 5.3(D), it is the responsibility of the Account Holder to send the Trustee a written beneficiary change notice if the Account Holder does not want the spouse to remain as the designated Beneficiary.

K. In the event of a dispute between two or more beneficiaries, the Trustee retains the right to apply to a court of competent jurisdiction for judicial settlement or to arbitration pursuant to Section 5.8(G). All fees and expenses incurred by the Trustee in connection with such action will be deducted from the assets of the Trust after reasonable notice is given to the beneficiaries. Such fees and expenses do not have to be approved by the court or an arbitrator.

5.5  Investments and Administration

The Trustee shall have the power and authority in the administration of this Trust to do all acts, including by way of illustration, but not in limitation of the powers conferred by law, the following:

A. Pursuant to the Account Holder's written directions (or those of the Account Holder's agent, if applicable) and notwithstanding any provision to the contrary in this Agreement, to invest and reinvest all or any part of the Trust in (i) cash, cash equivalents, exchange traded debt or equity securities (including options thereon and collectively defined as securities), mutual fund shares, savings media, and any other investment for the Trust under applicable law, to the extent they are not prohibited by Code Section 408(m) and the regulations thereunder, and (ii) with respect to which the Trustee agrees to provide Trust services. The allowable investments shall include, without limitation, any options on any security that may be held by the Trust under this Agreement and applicable law which is obtainable through the Brokerage Firm designated in the Application, either "over the counter" or on a recognized exchange. Any and all such investments and reinvestments must be acceptable to the Trustee without any duty on the part of the Trustee to diversify the investments or to make inquiry with regard to the investments or the written directions. The Trustee may absolutely rely on such written directions for the Account Holder that the Trustee believes to be genuine and will be fully protected in doing so;

B. To hold part or all of the Trust account uninvested or, pursuant to directions of the Account Holder to place the same in a savings account approved by the Trustee or purchase a Certificate of Deposit with an institution approved by the Trustee. However, the Trustee may, but need not, establish a program under which cash deposits in excess of a minimum set by it will periodically be invested in a savings account or money market mutual fund without direction of the Account Holder or his or her agent and the terms of any such program may be determined and altered at the discretion of the Trustee;

C. To employ suitable agents and counsel and to pay their reasonable expenses and compensations;

D. Pursuant to the Account Holder's written directions or agent, to write covered listed call options against existing positions and to liquidate or close such option contracts and the purchase of put options on existing long positions (the same securities cannot be used to simultaneously cover more than one position), to exercise conversion privileges or rights, to subscribe for additional securities and to make payments therefore;

E. Pursuant to the Account Holder or agent's written directions, and subject to Section 5.5(C), to consent to or participate in dissolutions, reorganizations, consolidations, mergers, sales, leases, mortgages, transfers or other changes affecting securities held by the Trustee;

F. To leave any securities or cash for safekeeping or on deposit, with or without interest, with such banks, brokers and other custodians as the Trustee may select, and to hold any securities in bearer form or in the name of the banks, brokers and other custodians or in the name of the Trustee without qualification or description or in the name of any nominee;

G. To invest contributions for Account Holder through the facilities of the Brokerage Firm designated in the Application (or equivalent facilities maintained by any other stockbroker or investment agent selected by the Account Holder and administratively pre-approved by the Trustee);

H. The Brokerage Firm named in the Application is designated by the Account Holder with authority to provide the Trustee with instructions, via confirmations or otherwise, implementing his or her directions to the Brokerage Firm to purchase and sell securities for his or her account. Before the entry of any orders to purchase or sell securities in this account, the Account Holder shall approve beforehand all such orders and direct the Brokerage Firm to implement his or her instructions. The Account Holder authorizes the Trustee to honor trades within his or her account without obligation to verify prior authorizations of such trades. The Brokerage Firm shall receive advices of available cash in this account and shall forward confirmation of purchases and sales to the Trustee. Selling short, and executing purchases in an amount greater than available cash are prohibited transactions. Investments in life insurance and collectibles are not permitted. No assets will be commingled. All investments outside of the brokerage account shall be accompanied by additional written instructions. Except as provided in Section 5.5(A), investments in offshore entities, foreign securities, and insurance contracts are not permitted under this Trust;

I. Except with respect to Paragraph R below and notwithstanding anything to the contrary contained in this Trust, the Trustee shall not make any investment or dispose of any investment held in the Trust, except upon the direction of the Account Holder or his or her agent;

J. The Trustee shall be under no duty to question any such direction of the Account Holder, to review any securities or other property held in the Trust, or to make suggestions to the individual with respect to the investment, retention, or disposition of any assets held in the Trust. The Account Holder hereby agrees to indemnify the Trustee and hold it harmless from and against any claim or liability which may be asserted against the Trustee by reason of its acting or not acting pursuant to any direction from the Account Holder or failing to act in the absence of any such direction;

K. In accordance with Section 404(c) under the Act and being that the Account Holder exercises control over his or her assets in this Trust which provides for his or her account such Account Holder or their Beneficiary shall not be deemed to be a fiduciary by reason of such exercise, and no person who is otherwise a fiduciary shall be liable under this Trust for any loss, or by reason of any breach, which results from such Account Holder's exercise of control;

L. The Account Holder may appoint in writing an Investment Manager or Managers to manage (including power to acquire and dispose of) any assets of this Trust. Any such Investment Manager shall be registered as an Investment Adviser under the Investment Advisers Act of 1940 ("1940 Act"). If investment of the Trust is to be directed by an Investment Manager, the Account Holder shall deliver to the Trustee a copy of the instruments appointing the Investment Manager and evidencing the Investment Manager's acceptance of such appointment, an acknowledgment by the Investment Manager that it is a fiduciary of the Trust, and a certificate evidencing the Investment Manager's current registration under the 1940 Act. The Trustee shall be fully protected in relying upon such instruments and certificate until otherwise notified in writing by the Account Holder;

The Trustee shall follow the directions of the Investment Manager regarding the investment and reinvestment of the Trust, or such portion thereof as shall be under management by the Investment Manager. The Trustee shall be under no duty or obligation to review any investment to be acquired, held or disposed of pursuant to such directions nor to make any recommendations with respect to the disposition or continued retention of any such investment or the exercise or non-exercise of the powers. Therefore, and in accordance with Section 405 (d) (1) under the Act, the Trustee shall have no liability or responsibility for acting or not acting pursuant to the direction of, or failing to act in the absence of any direction from, the Investment Manager, unless the Trustee knows that by such action or failure to act it would be itself committing or participating in a breach of fiduciary duty by the Investment Manager. The Account Holder hereby agrees to indemnify the Trustee and hold it harmless from and against any claim or liability which may be asserted against the Trustee by reason of its acting or not acting pursuant to any direction from the Investment Manager or failing to act in the absence of any such direction.

The Investment Manager at any time and from time to time may issue orders for the purchase or sale of securities directly to a broker; and in order to facilitate such transaction, the Trustee upon written request shall execute and deliver appropriate trading authorizations. Written notification of the issuance of each such order shall be given promptly to the Trustee by the Investment Manager, and the execution of each such order shall be confirmed by written advice via confirms or otherwise to the Trustee by the broker.

In the event that an Investment Manager should resign or be removed by the Account Holder, the Account Holder shall manage the investments pursuant to the terms of this Trust unless and until the Trustee shall be notified of the appointment of another Investment Manager with respect thereto as provided in this Paragraph L.

The Trustee shall be under no duty to question any such direction of the Account Holder or Investment Manager to review any securities or other property held in the Trust or to make suggestions to the Account Holder or Investment Manager with respect to the investment, retention, or disposition of any assets held in the Trust;

M. Notwithstanding anything herein contained to the contrary, the Trustee shall not lend any part of the corpus or income of the Trust to: pay any compensation for personal services rendered to the Trust; to make any part of its services available on a preferential basis to, or acquire for the Trust any property, other than cash, from or sell any property to any Account Holder, or to any member of an Account Holder's family, or to a corporation controlled by any Account Holder through the ownership, directly or indirectly, of 50 percent or more of the total combined voting power of all classes of stock entitled to vote or 50 percent or more of the total value of shares of all classes of stock of such corporation;

All contributions made by the Account Holder and all investments made with such contributions and the earnings thereon shall be credited to an account maintained for the Account Holder by the Trustee. Such account shall reflect the amounts contributed by the Account Holder;

N. Within ninety (90) days from the close of each Trust Year, the Trustee shall render an accounting, valuing the assets at fair market value, to the Account Holder. The accounting may consist of copies of regularly issued broker-dealer statements to the Trustee and copies of mutual fund, insurance company, and other investment summary account statements supplied to the Trustee. The Account Holder must file any exceptions or objections to the accounting with the Trustee in writing, within sixty (60) days of the mailing of such accounting. In the absence of such filing, the Account Holder shall be deemed to have approved such account; and in such case, or upon the written approval of the Account Holder of any such account, the Trustee shall be released, relieved and discharged with respect to all matters and things set forth in such account as though such account had been settled by the decree of a court of competent jurisdiction. No person other than the Account Holder may require an accounting or bring any action against the Trustee with respect to the Trust or its actions as Trustee.

The Trustee shall have the right at any time to apply to a court of competent jurisdiction for judicial settlement of its accounts for determination of any questions of construction, which may arise, or for instructions. The only necessary party defendant to such action shall be the Account Holder, except that the Trustee may, if it so elects, bring in as a party defendant any other person or persons;

O. The Trustee shall be fully protected in acting upon any instrument, certificate, or paper believed by it to be genuine and to be signed or presented by the Account Holder or such proper person or persons, and the Trustee shall be under no duty to make any investigation or inquiry as to any statement contained in any such writing but may accept the same as conclusive evidence of the truth and accuracy of the statements therein contained;

P. The Trustee shall be under no duty to question any direction of an Account Holder or his or her agent with respect to any investments, to review or monitor any securities or other property held in Trust, or to make suggestions to the Account Holder or his or her agent with respect to investment. The Trustee will not be liable for any loss that may result by reason of investments made in accordance with the directions of an Account Holder or his or her agent;

Q. Whenever the services of a stockbroker or a dealer are required, the Trustee shall retain the Brokerage Firm designated by the Account Holder in the Application. If no Brokerage Firm is currently selected, the Trustee may, in its discretion, appoint another stockbroker or dealer to handle investments in securities under the Trust;

R. The surviving spouse and/or Beneficiary shall be bound by this Section 5.5, including the indemnification provisions in paragraphs J and L above regarding investments and administration of their interest. Provided, however, should the Beneficiary be a minor or, in the discretion of the Trustee, of unsound mind, the Trustee may liquidate the interest of such Beneficiary and hold such interest in an interest bearing account or money market account until distributed;

S. To not vote in person or by proxy upon securities held by the Trustee and destroy such proxies if received by the Trustee.

## 5.6 Trustee Compensation

A. The Trustee shall be paid such reasonable compensation as shall from time to time be communicated to the Account Holder by the Trustee, and such compensation shall be chargeable to the Account Holder. The Account Holder hereby covenants and agrees to pay the same.

B. The Trustee shall charge the Account Holder any taxes paid by it which may be imposed upon the Trust or the income thereof or upon which the Trustee is required to pay, as well as all expenses of administration of the Trust, including but not limited to transaction costs, distributions, postage, commissions, fees, and reasonable attorney fees. The Account Holder hereby covenants and agrees to pay the same.

C. In the event the Account Holder shall at any time fail to pay the Trustee's compensation, taxes, and expenses within a reasonable time after demand for such payment has been made by the Trustee on the Account Holder, the Trustee will charge the Trust such compensation, taxes and expenses and may liquidate assets of the Trust for such purposes, as in its sole discretion, it shall determine. The custodian will and hereby agrees to collect such compensation, taxes and expenses for the Trustee as so directed by the Trustee in writing.

D. Notwithstanding any other provision contained in this Trust Agreement, all payments under this Section 5.6 and the liquidation of assets to obtain funds therefore may be made without the approval or direction of the Account Holder. If the Trust is not sufficient to satisfy the Trustee's compensation, fees, taxes, and expenses, then the Trustee will charge the Account Holder for such unpaid compensation, fees, taxes, and expenses.

## 5.7 Amendment and Termination

A. Each Account Holder who adopts this Trust delegates to the Trustee the power to amend this Trust, including any retroactive amendments, by submitting a copy of such amendments to each Account Holder, but only after receiving:

1. A favorable ruling or determination letter from the Commissioner of IRS that the Trust, as amended, continues to meet the requirements of Code Section 408, or 408A

2. Each Account Holder shall be deemed to have consented to any and all such amendments. In addition, the Trustee may amend the fee schedule from time to time with advance notice to the Account Holder and is not required to seek approval from the IRS.

The Account Holder shall be permitted to revoke this Trust in writing within a period not to exceed seven (7) days after the date that the Account Holder adopted this Trust. In the event of such revocation, the Trustee will return the entire account plus any Trustee compensation, taxes and expenses as soon as practical.

B. Neither the Account Holder nor the Trustee shall have the right to amend or terminate this Trust in such a manner as would cause or permit all or part of the entire interest of the Account Holder to be diverted for purposes other than their exclusive benefit or that of their Beneficiary. No Account Holder shall have the right to sell, assign, discount, or pledge as collateral for a loan any asset of this Trust.

C. An Account Holder shall have the right to terminate or partially terminate this Trust, at any time and from time to time, by delivering to the Trustee a signed copy of a statement of termination.

D. Either the Trustee or the Account Holder may terminate this Trust upon thirty (30) days written notice to the other. Upon resignation or removal of the Trustee, the Account Holder shall appoint a successor trustee that shall have the same powers and duties as are conferred upon the Trustee hereunder and in default thereof, such successor trustee may be appointed by a court of competent jurisdiction.

In the event of removal or resignation of the Trustee, if the Account Holder fails to appoint a successor trustee and complete the transfer of assets within 30 days of the date the Trustee mails such termination notice to the last address on file for the Account Holder or the Account Holder mails such notice to the Trustee, the Trustee may in its discretion, transfer the assets to a successor trustee of its choosing, or liquidate and distribute the assets, less any amounts withheld for Trustee compensation, taxes, and expenses, to the Account Holder. The Trustee will not be responsible for any penalties, fines, taxes, or tax consequences that may result from such distribution or transfer.

E. Upon the delivery by the resigning or removed trustee to its successor trustee of all property of the Trust, less such reasonable amount as it shall deem necessary to provide for its compensation and any taxes and expenses or advances chargeable or payable out of the Trust, the successor trustee shall thereupon have the same powers and duties as are conferred upon the Trustee.

F. No successor trustee shall have any obligation or liability with respect to the acts or omissions of its predecessors.

The actual appointment and qualification of a successor trustee to whom the Trust assets may be transferred are conditions which must be fulfilled before the resignation or removal of the Trustee shall become effective. The transfer of the Trust assets shall be made coincidentally with an accounting by the resigned or removed Trustee and such resigned or removed Trustee shall endorse, transfer, convey and deliver to the successor trustee all of the funds, securities or other property then held by it under the Trust, together with such records as may be reasonably required in order that the successor trustee may properly administer the Trust.

G. This Trust Agreement and the Trust created hereby will be terminated in the case of complete distribution of the Trust.

H. The Trustee shall not have the right to modify or to amend this Trust retroactively in such a manner as to deprive any Account Holder or his or her Beneficiary of any benefit to which he or she may be entitled under this Trust Agreement by reason of contributions made prior to the modification or amendment, unless such modification or amendment is necessary to conform this Trust to, or satisfy the conditions of, any law, governmental regulation or ruling, or to permit this Trust to meet the requirements of Code Section 408.

I. If the Trustee receives any claim to assets held in the Trust which is adverse to the Account Holder's interest or the interest of his or her Beneficiary, and the Trustee, in its absolute discretion, decides the claim is, or may be, meritorious, the Trustee may withhold distribution until the claim is resolved to its Trustee shall be entitled to reimbursement of all costs, fees and expenses, including reasonable attorney's fees, directly from the Trust assets, without the approval or direction of the Account Holder. If necessary, the Trustee may liquidate Trust assets in order to be reimbursed. As an alternative, the Trustee may deposit all or any portion of the assets in the Trust into the court. Deposit with the court shall relieve the Trustee of any further obligation with respect to the assets deposited. The Trustee has the right to be reimbursed from the funds deposited with the court for legal fees and costs incurred. Such reimbursement may be made directly from the Trust assets without approval or direction of the Account Holder. If necessary, the Trustee may liquidate Trust assets in order to be reimbursed as stated above.

6.8 Miscellaneous

A. Notwithstanding anything to the contrary contained in this Trust Agreement or in any amendment thereto, no part of the Trust other than such part as is required to pay the Trustee's compensation, taxes, and administration expenses (including the reimbursement referenced in Section 6.7 (I), shall be used for, or diverted to, purposes other than for the exclusive benefit of the Account Holder, their Beneficiaries, or their estates. The Trust account is established for the exclusive benefit of the Account Holder or his or her Beneficiary.

B. The Trustee shall not be liable for any act or omission made in connection with the Trust except for its intentional misconduct or negligence. Any required notice regarding the Trust will be considered effective when the Trustee mails it to the last address of the intended recipient which is contained in the Trustee's records. Any notice to be given to the Trustee will be considered effective when the Trustee actually receives it. The Account Holder and/or Beneficiaries must notify the Trustee of any change of address in a manner acceptable to the Trustee.

C. To the extent the Trustee is engaged in any form of litigation, arbitration, or dispute resolution concerning the Trust assets or the interest of the Trust, the Trustee shall be entitled to recover all costs, fees and expenses, including reasonable attorney's fees, directly from the Trust assets, pursuant to Section 6.7(I).

D. The terms and conditions of this Trust Agreement shall be applicable without regard to the community property laws of any state.

E. If the Account Holder is married, the Compensation of the Account Holder and any contributions made to this Trust under Section 4.2 shall be determined without regard to the Compensation of the spouse.

F. The captions of Articles and Sections in this Trust Agreement are included for convenience only and shall not be considered a part of, or an aid to, the construction of this Trust.

G. The Account Holder agrees that all controversies between the Account Holder and/or Beneficiaries and the Trustee and any of its officers, directors, agents or employees (present or former) concerning or arising from (i) any account maintained with the Trustee by the Account Holder; (ii) any transaction involving the Account Holder's account, whether or not such transaction occurred in such account or accounts; or (iii) the construction, performance or breach of this Trust Agreement, whether such controversy arose prior, on or subsequent to the date hereof, shall be determined by arbitration under the commercial arbitration rules of the American Arbitration Association disclosed below. Any disputes as to the arbitrability of a matter or the manner of such arbitration shall be determined in such arbitration. Such arbitration shall be held in Wilmington, Delaware.

Arbitration Disclosures: Arbitration is final and binding on the parties except to the extent superceded by the Code or the Act; the parties are waiving their right to seek remedies in court, including the right to jury trial; pre-arbitration discovery is generally more limited than and different from court proceedings; the arbitrators' award is not required to include factual findings or legal reasoning, and any party's right to appeal or to seek modification of rulings by the arbitrators is strictly limited; the panel of arbitrators will consist of arbitrators for American Arbitration Association; the arbitration will be under the commercial arbitration rules of the American Arbitration Association; the arbitration shall be held in Wilmington, Delaware; and any disputes as to such arbitration or the manner thereof shall be determined in such arbitration.

H. The determination that any provision of this Trust Agreement is not enforceable in accordance with its terms in a particular jurisdiction shall not affect the validity or enforceability of the remaining provisions of this Trust Agreement generally or in any other jurisdiction or as to any other parties, but rather such unenforceable provisions shall be stricken or modified in accordance with such determination only as to such parties and this Trust Agreement, as so modified, shall continue to bind the specific parties involved therein and otherwise all other parties in unmodified form.

I. All contributions to this Trust shall be deemed to take place in the State of Delaware.

J. This Trust Agreement may be executed in any number of counterparts, each one of which shall be deemed to be the original although the others shall not be produced.

K. This Trust Agreement is made pursuant to and shall be construed in accordance with the laws of the State of Delaware. Jurisdiction and venue of any matter not subject to the arbitration provisions of this Trust Agreement shall lie solely in the courts of the State of Delaware.

L. The Trustee shall furnish annual calendar-year reports concerning the status of the Account and such information concerning required minimum distribution as is prescribed by the Commissioner of Internal Revenue.